## PETER L. YOE

### *v.*

## ANDREW McCORD.

1. WILL — *what proof necessary to admit to probate.* The statute requires a party producing a will for admission to probate in the county court to prove nothing but its formal execution and that the testator was of sound mind and memory at the time of its execution.

2. The statute does not require that a will should be *signed* in the presence of two or more credible witnesses. It is sufficient if two attesting witnesses heard the testator acknowledge that he signed it.

3. An instruction that signing and acknowledging a will is not sufficient to entitle it to probate, but that it must further appear that it was the actual deed of the testator, requires more than the statute, and is for that reason wrong.

4. SAME — *testimony of subscribing witness need not be in words of the statute.* It is not necessary that a subscribing witness to a will should state on oath in so many words that he believed the testator to be of sound mind and memory. It is sufficient if he so declares in legal effect.

5. SAME — *meaning of sound mind and memory.* If the testator's mind is sound, although his memory may be impaired, he is of sound mind and memory in the sense in which the phrase is used in law, and, in order to destroy the capacity of a person to make a will on account of failure of

5—74TH ILL.

memory, the failure must be total or extend to his immediate family and property.

6. If the mind and memory of a testator are sufficiently sound to enable him to know and understand the business in which he is engaged at the time of executing his will, then he is of sound mind and memory within the meaning of the law.

7. On the trial of the question as to whether a will shall be admitted to probate, an instruction that if the jury believe, from the testimony of the subscribing witnesses, that the testator was of unsound mind *or* memory, they should find against the will, makes an unwarrantable distinction between " sound mind" and " sound memory," calculated to mislead the jury, and should not be given.

8. SAME — *what facts will invalidate a will is a question of law, and not to be left to a jury.* What acts of fraud or improper conduct in procuring the execution of a will, will invalidate it, is a question of law, and a jury should not by an instruction be left at liberty to invalidate a will for what according to their own notions may be improper conduct sufficient for that purpose.

9. SAME — *question of capacity to make a will left to a jury most be general.* The question as to the capacity of a testator, when submitted to a jury, should be, had he the capacity to make *a* will, not had he the capacity to make *the will* produced.

10. SAME — *undue influence over testator implies something wrongful.* It is not unlawful for one by honest advice or persuasion to induce a testator to make a will or influence the disposition of his property by will. To vitiate a will on account of *undue* influence it must appear that there was something wrongful, a species of fraud perpetrated.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

Messrs. AYER & KALES, for the appellant.

Mr. MELVILLE W. FULLER, and Messrs. HOLDEN & MOORE, for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a proceeding, commenced in the county court of Cook county, on the 6th of March, 1873, by Peter L. Yoe, the appellant, as executor, for the probate of the will of John Mc-Cord, deceased. The will was admitted to probate by the

county court. Andrew McCord, one of the heirs, took an appeal from this order of the county court to the circuit court of Cook county, where, upon trial had, the verdict of the jury was against the will, and judgment was entered accordingly. From which judgment the executor has taken this appeal.

At the trial below, the probate of the will was resisted on two grounds: *First*, that the testator was not of sound mind and memory at the time of signing or acknowledging the will; and, *second*, that its execution was procured by undue influence. Some of the attendant circumstances it may be proper to consider, as bearing upon the legal points to be discussed.

John McCord died on the 1st of March, 1873, at the age of sixty-nine. The will was executed on the 6th of August, 1872. At the time of his death the decedent resided at the village of Blue Island, in Cook county, where he had lived since about April 1, 1871, having at that time removed thither from a farm upon which he had ever before lived, he being a farmer by occupation.

On the 28th of November, 1870, his brother, Jason McCord, a resident of Chicago, died intestate, leaving an estate, consisting principally of improved real property, situated in the business portion of Chicago, said to have been worth upwards of seven hundred thousand dollars. John McCord was the only heir of his brother Jason, and succeeded to the ownership of this estate by inheritance. Peter L. Yoe, the appellant, had been for many years the intimate friend and confidant of Jason McCord, and employed to some extent in the management of his business affairs, and John McCord united with him in taking out letters of administration upon his brother's estate. Yoe became in fact the acting administrator, transacting pretty much all the business. On the 23d of December, 1870, soon after his appointment as administrator, John McCord gave him a power of attorney to manage all his real estate in Cook county, Mr. McCord at that time residing on his farm at Homer, in Will county. In October, 1871, by the disastrous fire of that month, every building belonging to the Jason McCord

estate in the city of Chicago was totally consumed, there be-
ing among them six large and costly stores.

On the 27th of November, after the fire, Mr. McCord gave to
Yoe another power of attorney for the management of his real
estate in Chicago, with authority to build upon and improve the
same.    At the time of the making of the will only two of the
stores had been rebuilt.

Some time in June, 1872, when Mr. McCord was in Chicago,
he called upon his attorney, Mr. Hosmer, and consulted him
professionally about making a will, and explained to him fully
how he wished to make his will, which agreed substantially
with the one afterward drawn and now in question.    About
the last of July Mr. McCord sent for Mr. Yoe, with the view
of making some disposition of his property.    Mr. Yoe called
upon Mr. Hosmer, and took the latter with him down to Mr.
McCord's.    Mr. McCord told Yoe he had sent for him for the
purpose of dividing and deeding his property to his children,
but on their consultation together, it was decided to make a will.
Mr. Hosmer took down from Mr. McCord, on paper, his di-
rections for the making of the will.    The former returned to
Chicago, and drew the will.    On the 6th of August, 1872, he,
with Mr. Yoe, went down to Blue Island, taking with them
the draft of the will, and on that day Mr. McCord executed it.

The will, after giving to the widow the homestead and an
annuity of $1,000 a year, divided the property equally among
the children, share and share alike, placing it in the hands of
Mr. Yoe, the executor, as trustee, to manage and pay over the
income, until the youngest child should attain the age of twenty-
one, which will be on the 9th of November, 1883.    The value
of the property devised is supposed to be from seven to eight
hundred thousand dollars ; the personal property being worth
not far from $200,000.    The testator's children at the time the
will was made were eight in number, three of whom were
minors.

The statute of this State in relation to the execution and
proof of wills, provides as follows :

" All wills, testaments and codicils by which any lands, tene-
ments, hereditaments, annuities, rents, or goods and chattels
are devised, shall be reduced to writing, and signed by the
testator or testatrix, or by some person in his or her presence,
and by his or her direction, and attested in the presence of the
testator or testatrix, by two or more credible witnesses, two of
whom declaring on oath or affirmation before the county court
of the proper county, that they were present and saw the testa-
tor or testatrix sign said will, testament or codicil in their pres-
ence, or acknowledged the same to be his or her act and deed,
and that they believed the testator or testatrix to be of sound
mind and memory at the time of signing or acknowledging
the same, shall be sufficient proof of the execution of said will,
testament or codicil, to admit the same to record : *Provided*,
that no proof of fraud, compulsion, or other improper conduct
be exhibited, which, in the opinion of said county court, shall be
deemed sufficient to invalidate or destroy the same."

By the first clause of contestant's first instruction given to
the jury, they were instructed : " That in all cases the party
propounding a will is bound to prove that the paper in ques-
tion does declare the will of the deceased."

It is to be borne in mind what the nature of this proceeding
is, that it is the exhibition of a will for probate, not a case of
contesting the validity of the will under section seven of the
statute of wills. The probate of the will is not conclusive, but
such section of the present statute provides, that within three
years thereafter (the former one five years), any person inter-
ested, may, by bill in chancery, contest the validity of the will,
when an issue at law shall be made up and tried by a jury
whether the writing produced be the will of the testator or not.
The statute contemplates the proceeding for admission to pro-
bate as summary, requires no notice to be given, and declares
it, in express terms, the duty of the county court to receive
probate of the will without delay.

The statute defines what shall be sufficient proof to admit a
will to probate.

It requires the party propounding a will to prove nothing but its formal execution, and that the testator was of sound mind and memory at the time; and does not require him to go further, as the instruction implies, and make proof in addition, "that the paper in question does declare the will of the deceased."

The second instruction was, in part, as follows, that the jury must be satisfied "that said John McCord signed it (the instrument propounded), and that he attested it in the presence of two or more credible witnesses; and it is also necessary that said two witnesses, if the jury find from the evidence there were but two, must have declared on oath, on this trial, that they were present and saw the said John McCord sign said will in their presence or acknowledge the same to be his act and deed, and also that they believed the said McCord to be of sound mind and memory at the time of signing or acknowledging the same; and it is also necessary that no proof of fraud, compulsion or other improper conduct shall have been exhibited on this trial which the jury shall deem sufficient to invalidate or destroy the said instrument as the will of said John McCord, deceased."

The first clause of this instruction requires that the instrument should be *signed in the presence* of two or more credible witnesses.

This the statute does not require. If it is acknowledged in the presence of the witnesses it is sufficient, although they did not see the testator sign it, or though it was not signed in their presence. Neither of the attesting witnesses in this case remembers to have seen the deceased sign the will, but they both heard him acknowledge it.

By the second clause of this instruction, the jury would naturally be led to infer that it was essential to the admission of the will to probate, that the two attesting witnesses should have declared, on oath, in so many words, and according to this particular formula, " That they believed the said McCord to be of sound mind and memory at the time of signing or acknowledging

the same." In obedience to such an instruction, the jury could not well have found a verdict for the proponent. One of the subscribing witnesses, Roche, after testifying that "Mr. McCord's mind was all right as regards sanity," said, he did not think he had a sound memory; "that is, I don't think he had a good memory."

Now, here the witness could not declare, on oath, in so many words, that he believed the testator to be of sound mind and memory, and yet he did declare so in legal effect, which was sufficient. He testified that he thought the testator knew what property he owned, believed he knew the number of his children, that he understood about his property, and the natural objects of his bounty.

If the testator was of sound mind, but of poor or impaired memory, he was of sound mind and memory, as the phrase is known in the law. The failure of memory is not sufficient to create the incapacity, unless it be quite total, or extend to his immediate family and property. *Turner* v. *Cheesman*, 15 N. J. Eq. R. 243. It was evidently the witness' mistaken idea that a sound mind was incompatible with a poor memory, and hence, in his testimony, could not come up to the requirement of the instruction, as the jury would naturally take it to be; and the tenth instruction is liable to a similar objection.

The last clause of the instruction which we are considering declared it to be necessary to the admission of the will to probate, that no proof of fraud, compulsion, or other improper conduct, shall have been exhibited, "which the jury shall deem sufficient to invalidate or destroy the said instrument." It is a question of law what is such improper conduct as will invalidate a will, and it is only to be avoided by such conduct as the law deems sufficient for that purpose, not a jury; and a jury should not, by an instruction, be left at liberty to invalidate a will for what, according to their own notions, may be improper conduct sufficient for that purpose.

The following further instructions were given for the contestant:

"4. The jury are instructed, as matter of law, that if the testimony of the two witnesses subscribing the alleged will of John McCord, deceased, taken together, satisfies the jury that said McCord, at the time of the making and execution of the alleged will, had not a *sound memory,* nor sufficient mind, nor a mind in a proper state for disposing of his estate with reason, or according to any fixed judgment or settled purpose of his own, then said will should not be admitted to probate, and the jury should find accordingly."

We regard such an instruction as improper, and calculated to mislead a jury.

If the testator's mind was sound, that was enough, without requiring it also to be in a suitable *state.* A man's mind, his temper, his disposition, his feelings, may be in an improper state, without impairing his legal capacity to make a deed or will.

The jury are also told that the testator's mind must be in a proper state for disposing of his property according to some fixed judgment and settled purpose of his own. This is not the language of the law; it does not go any way to the enlightenment of the jury, and its natural effect is to confuse and mislead a jury.

"9. The jury are instructed that if they find, from the evidence given by the two witnesses who subscribed the alleged will of John McCord, deceased, that said alleged will was made and executed by him at a time when said McCord was of unsound mind or memory, then the jury must find the instrument in question is not the will of said John McCord." ·

The expression used in the statute is, "sound mind and memory." By substituting the disjunctive conjunction "or" for the copulative "and," as is done in this instruction, an unwarrantable distinction, as we regard, is attempted to be marked between "sound mind" and "sound memory."

The expression "sound mind and memory," as used in the statute, we conceive means nothing more than the words "sound and disposing mind," frequently employed in reference

to this subject. Here, as elsewhere, the phrase has been treated by the court as equivalent to the term " sanity." *Dickie* v. *Carter*, 42 Ill. 377 ; *Andrews* v. *Black*, 43 id. 256.

Littleton makes the terms " of non-sane memory," " non compos mentis," and " not of sound memory," convertible terms. 2 Co. Litt., § 405. And Coke, in his note, defines one *non compos mentis* (aside from natural idiots, lunatics and drunken men), as one that " by sickness, grief, or other accident, wholly loseth his memory and understanding." Comyn in his digest, Bacon in his abridgement (title Idiots), employ the terms in the same way. The statute of wills, 34 and 35 Henry VIII, does the same by providing that no will of lands shall be valid if made by any idiot or by any person of " non-sane memory." So that, as known in the law, " sound memory " is something quite different from good or unimpaired memory, in which latter sense the subscribing witness, Roche, evidently understood it. Failure of memory does not constitute unsoundness of memory.

Much testimony in the case consisted of instances of defect of memory in the deceased, and in view of the evidence, the variation from the language of the statute, by the use of the language sound mind *or* memory, was highly calculated to mislead the jury, in bringing in undue prominence before them the mistaken notion of the subscribing witness as to what constituted sound memory, and leading them to think it had the sanction of the court.

"11. It is essential to the sound memory required by the statute, for the making of a valid will, that the testator should possess something more than mere *passive* memory. He must undoubtedly retain sufficient *active* memory to collect in his mind without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least their more obvious relation to each other, and be able to form some rational judgment in relation to them. And the elements of such a judgment include the number of his children, their deserts with reference to conduct

and capacity as well as need, and what he had before done for them relating to each other, and the amount and condition of his property.

"And if in this case the jury believe, from the evidence of the subscribing witnesses to the will in question, taken together, that John McCord, at the time the said will was made and executed, did not retain sufficient active memory to collect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their more obvious relations to each other, and to form a rational judgment in relation to them, that he did not possess sufficient memory to realize the nature and extent of his property, or the number, conduct, and capacity of his children, then the jury would be justified in finding that the alleged will is not entitled to be admitted to probate."

"13. The jury are instructed that the mere fact of the signing and acknowledgment of the alleged will by the said John McCord does not entitle it to be treated or considered as his will, and that in addition thereto it must appear to the jury, from the evidence, that it is his actual deed, and if they should find, from the evidence, that he did not know each and all of its provisions, then it is not his will."

The first of the two last above instructions was condemned by this court in *Trish et al.* v. *Newell et al.* 62 Ill. 197, as requiring, or as calculated to impress a jury that there was required a greater amount of mental capacity and power of memory than is possessed by, perhaps, the generality of men.

In any thing that might have there been said with reference to the competency of mind to make the will which may be in question, we would not wish to have it inferred that we admit the idea that it is in general a proper question to submit to a jury, whether the testator had sufficient capacity to make the particular will produced.

One grossly ignorant, or of very limited mental capacity, if otherwise of sane mind, may make any instrument, however

complex it may be, and be bound thereby. Written instruments would be very precarious securities of men's rights, if they were subject to be thus invalidated, and have their validity depend upon the result of an inquiry before a jury whether, according to their belief, the maker had sufficient capacity to make the particular instrument which might be in question. We agree with the rule as held in *Delafield* v. *Parish*, 25 N. Y. 9, that the question is, had the testator, as *compos mentis*, capacity to make a will; not, had he capacity to make the will produced.

The last above instruction is erroneous in telling the jury that the signing and acknowledgment of the alleged will was not sufficient, but that in addition thereto it must appear that it was the actual deed of the testator. The statute requires no such thing. The instruction was further wrong in saying that if the testator "did not know each and all of its provisions," then the instrument was not his will.

Most written instruments probably would fail to stand the test of any such rule.

Writings are constantly passing from one to another in the every day transactions of business, where the makers are more or less ignorant of their entire contents, executed often without reading or hearing them read, in trust upon some other person for their being correct, where there may be, in fact, no actual knowledge of what they do contain. A written instrument is not to be defeated by evidence that the maker did not know each and all of its provisions. The idea is inadmissible. Where the testator is shown to have executed an instrument as his will, being in his right mind, and there is nothing of fraud or imposition, it will be presumed that he was aware of its contents.

The general rule is, that proof of the testator's signature to the will is *prima facie* evidence of his having understandingly executed the same. *Weigel* v. *Weigel*, 5 Watts, 486; *Beall* v. *Mann*, 5 Ga. 456.

"20. The jury are instructed, as matter of law, that although they may believe, from the evidence, that the deceased, John

McCord, was possessed, at the time of the making and execution of the alleged will in question, of a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if they further believe, from the evidence, that the proponent, P. L. Yoe, acquired such dominion and influence over said McCord in relation to his property as to prevent the exercise of a sound discretion on his part in relation thereto, and that said Yoe exerted such dominion and influence over said McCord, in reference to the making and execution of the alleged will in question, to such an extent as to substitute for the will said McCord designed and desired to make, and would have made, if he had been left in the exercise of mental free agency, a will according to the views of said Yoe, then such latter instrument would not be entitled to probate; and the jury should find accordingly."

We regard this instruction as erroneous, in that it does not embrace the element of fraud or wrong in the dominion and influence mentioned in the instruction. It is not unlawful for a man by honest advice, or persuasion, to induce a testator to make a will, or to influence the disposition of his property by will.

Such advice or persuasion will not vitiate a will made freely and from conviction of its propriety, though such will might never have been made but for such advice or persuasion. This does not amount to fraud, compulsion or other improper conduct. To avoid a will, the influence which is exercised must be *undue*, and this, in the legal sense, is something wrongful, a species of fraud. *Dickie et al.* v. *Carter*, 42 Ill. 376; *Roe* v. *Taylor*, 45 id. 485; 1 Redf. on Wills, 514. The instruction might have been refused, too, as inapplicable, there being no evidence to base it upon.

For the reasons indicated we regard the foregoing instructions as erroneous.

To define the exact degree of mental capacity requisite to the making of a valid will is confessedly a difficult task.

Where it is attempted, in a multiplicity of instructions to a jury, it is quite apt to bring error into a record. Observations made use of in judicial opinions, in illustration of views upon a point decided, are to be found, which may be well in reference to the case in hand, and as understood by the professional mind, but when extracted and embodied in instructions, as rules for the guidance of a jury in perhaps some entirely different case, they not infrequently may be inapposite, and from their vague generality, or metaphysical cast, be of no practical use to a jury in leading them to a right conclusion, but, on the contrary, tend to mislead them.

In *Horne* v. *Horne*, 9 Ired. 99, with reference to the amount of testamentary capacity necessary, it is said it is sufficient if the testator knew what he was doing, and to whom he was giving his property, and in the note to its citation, in 1 Redfield on Wills, 125–127, it is said, this is about as accurate and brief a definition as can be given. Other courts have declared it in a similar plain form, as, in 7 Serg. & Rawle, 90, as to making a will, it is said, " There is no standard by which the understanding is to be weighed, but one: has the party such a portion of understanding as would enable him to do any binding act ? " In *Kinne* v. *Kinne*, 9 Conn. 104, " Had he an understanding of the nature of the business he was engaged in, a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it, and the manner he meant to distribute it between them ? or, as was said by WASHINGTON, J., in *Stevens* v. *Vancleve*, 4 Wash. C. C. R. 267, " To sum up the whole in the most simple and intelligible form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed his will ? "

Such plain definitions may be of service to a jury in informing them as to the legal meaning of sound mind and memory.

In 1 Redfield on Wills, 123–124, the author states that " the result of the best considered cases upon the subject seems to put the quantum of understanding requisite to the valid

execution of a will upon the basis of knowing and comprehending the transaction, or in popular phrase, that the testator should, at the time of executing the will, know and understand what he was about." This last mode of expression of the doctrine is intelligible to a jury, and embodies about the whole rule upon the subject, so far as it can be profitably given to a jury. And whether the testator did thus know and understand, is a question of fact for the jury, for them to judge of and determine from all the evidence before them. When a court undertakes to inform them what amount of mental capacity a man must have to know and understand what he is about, it is futile, and tends rather to mislead than to afford any practical aid to a jury.

As to the evidence in the case, without entering upon the review of it in detail, we will remark that, from a full examination thereof, we see no sufficient reason why the will should have been refused admission to probate. As before intimated, we find no proof whatever of undue influence.

The will, in all its parts, was an eminently proper one to be made, under the circumstances of the testator's property and family. No doubt the testator's mind had become somewhat impaired by age, and many instances of defect of memory appear in evidence. But the deficiency of mind or memory disclosed falls quite short of amounting to unsoundness of mind and memory.

There was clearly testamentary capacity.

If wills are liable to be set aside upon such testimony as is exhibited in this record, the privilege of disposition of property by will is an uncertain one indeed.

The judgment of the court below must be reversed.

*Judgment reversed.*