## CAPACITY TO MAKE A WILL.

[Circuit Court of Cuyahoga County.]

AMELIA K. REWELL v. JOSIE R. WARDEN ET AL.

Decided, February 4, 1903.

*Will—Competency of Testator to Make—Undue Influence—Can Not be Inferred, When.*

1. One has sufficient mental capacity to make a valid will when he is able to enumerate his property, and remembers who are the natural objects of his bounty, and successfully conducts considerable business interests, notwithstanding he may be eighty-four years old and somewhat forgetful as to minor matters.

2. A bequest to his wife of something over one-third of the testator's estate is not so in excess of her rights as to raise a presumption of undue influence. Nor is undue influence shown by the fact that she was a third wife and treated him with great kindness, anticipating his wants and aiding him in his affairs.

MARVIN, J.; HALE, J., and CALDWELL, J., concur.

Error to the court of common pleas.

The action below was brought by Josie R. Warden, who is a daughter by adoption of Captain Cornelius Rewell, deceased, against Amelia K. Rewell, widow of said deceased; George M. Rewell, a son of said deceased; Jessie M. Rewell, wife of said George, she being a beneficiary under the will of said deceased, and John Wilson and Homer O. Stafford, executors of said will. The only heirs at law of the deceased are the said Josie R. Warden and the said George M. Rewell.

Cornelius Rewell died March 22, 1899, at the age of eighty-four years. His widow was his third wife. His second wife died June 18, 1895. On February 16, 1899, he executed a written instrument purporting to be his last will and testament. This was properly witnessed as such will and in this opinion is hereafter spoken of as a will. This will was duly admitted to probate in this county and letters testamentary issued thereon to the defendants, Wilson and Stafford, who are named as executors in said will. By the terms of said will all of the property of the testator is disposed of. His estate was worth about $32,000,

of which he bequeathed to Mrs. Warden the sum of $25; to his widow a property worth about $13,500; to his daughter-in-law, Jessie M. Rewell, property of about the value of $18,500; this last bequest being his entire estate not disposed of to the other parties to whom bequests were made.

The petition sets out that the writing hereinbefore mentioned was not the will of said Cornelius Rewell; that at the time of its execution said decedent was not of sound mind and memory and did not have testamentary capacity, and that "he was persuaded, influenced, induced, deceived and coerced by the said Amelia K. Rewell and by others acting in her interest, and so was not free from restraint and undue influence." The prayer of the petition is that said writing may be adjudged not to be the last will and testament of the deceased.

Proper issues being made in the case, it went to trial in the court of common pleas to a jury who returned a verdict that the writing was not the will of the deceased. Motion for new trial was made by Amelia K. Rewell, which was overruled and exception taken, and the case comes here for review on proceedings in error. A bill of exceptions is presented in this court containing all the evidence introduced upon the trial, together with the charge of the court given to the jury and the requests to charge made by the parties in the case.

On the part of the plaintiff in error it is urged that the verdict is not sustained by the evidence. So far as the claim made by the plaintiff below, that the defendant, Amelia K. Rewell, or any one in her interest unduly influenced the deceased is concerned, we find nothing to sustain it. The evidence is that Mrs. Rewell, who was the third wife of the deceased and who was married to him on May 24, 1896, treated him with great kindness, anticipated his wants and aided him more or less in his affairs. To hold that such conduct on the part of his wife was to unduly influence him in her behalf would be to ignore what we regard as the highest duty of a wife to her husband. When she married Captain Rewell she undertook and agreed to treat him with affection and kindness; to aid him, so far as she could, in whatever was to his interest, and surely the faithful carrying out of this obligation ought not to be charged up against her

as being an effort on her part to unduly influence him in her favor. She wanted his affection or she would not have married him; she was entitled to his affection, or he should not have married her; he needed her kindly offices and was entitled to receive them, and nothing in the evidence tends to show that her conduct toward him was other than in the highest degree commendable. Nor is there is any evidence tending to show that any one in her behalf tried to influence him unduly in her favor. She seems to have been affectionate and kind to him and he to have appreciated and reciprocated that kindness and affection. In this the conduct of each was commendable. We find nothing in the will itself, when taken in connection with the undisputed evidence, to indicate that he was unduly influenced by anybody, or that the will was one which, in the nature of things, should excite a suspicion of undue influence or of want of mental capacity.

Mrs. Warden, though she would have been an heir at law had he died intestate, was so only because she had been legally adopted by him as a daughter. The evidence clearly shows that he loved this daughter. He often spoke of her in the same affectionate manner which might be expected of a father speaking of his daughter. But there had been trouble between her husband and Captain Rewell, growing out of a loan which had been made to Mr. Warden. This loan amounted to about $4,700. Warden had not paid it, his claim being that it was money of Mrs. Rewell, the second wife of Captain Rewell and the adopting mother of Mrs. Warden. Captain Rewell claimed that the money was due to him. Without reference to which of the parties was right in the claim made as to this money, it may well explain why Captain Rewell should have a feeling against Mr. Warden and against giving any part of his property in such wise that it could benefit Warden. Whether Warden had really wronged him or not, Rewell believed that he had, and so believing, it is not extraordinary that a man of sound mind should have felt that no more of his property should go into the family of Mr. Warden.

As to his son George, it seems clear from statements made by Captain Rewell himself and from the evidence in the case that he felt that George and his family would be much more benefited

by having a bequest made to his wife than by having it made to him. George had not been fortunate in business, and it was evidently the fear of Captain Rewell that property bequeathed to him might be seized by his creditors, and so his family be entirely deprived of the benefit of it, whereas, if it were given to Mrs. Jessie M. Rewell, George and his family would thereby be provided for.

The amount bequeathed to the widow of the deceased, as compared with his entire estate, is not so great as to raise a probability that he was unduly influenced, or that he was of unsound mind.

Coming now to the testimony of the witnesses as to the mental capacity of Captain Rewell:

We find, first, Captain George Stone, an old and intimate friend of the deceased. He noticed in the last years of Captain Rewell's life that his memory was not as good as it had been earlier. He mentions the case of Rewell asking him in reference to a sister of the witness. Witness told him that she was alive. Rewell said it seemed to him that he had heard she was dead, and then this language is used by the witness: "And then perhaps he would ask the same question right over again, in a little while the same." It will be noticed that he does not specifically give an occasion when this occurred, as though he were following up one conversation, but as though he had noticed a general tendency on the part of Captain Rewell to forget what had been said to him on some subject and asked about the same subject again. He gives another instance of his asking several times where a Mrs. Simpson was, he having answered the first time the question was asked him that she was at Vermillion. He says that during one conversation he made inquiry about this woman at least three times.

Edward Keron, who lived in a house belonging to Captain Rewell and who saw him very often, says that he was somewhat forgetful; that he would ask the same question three or four times within a short space of time. He mentions especially the fact that Captain Rewell gave him the details of a story of a trip he made on the lakes once in going to Buffalo, when they

had a great storm.  Witness says Rewell told him this twelve or fifteen times during the last year of his life.

If every man who repeats a good many times over to the same persons some extraordinary event of his life were to be held of unsound mind, it would include a very large percentage of those who have passed the age of sixty years; in short, there was evidence in this only of the fact that, like other old men, he was given to reminiscence and would be very likely to repeat the story of some remarkable incident in his life.  Captain Rewell asked this man for rent at one time when the rent had been paid the day before.  The captain seemed to have forgotten it.  Witness says he was forgetful about making repairs on the house which he rented of him.

Witness Byers, who is a notary public and who deals somewhat in real estate and who sells coal, was well acquainted with Mr. Rewell, who frequently called at the office of the witness and frequently asked of the witness if he were doing well in his business, and how much he got for selling coal.  He also asked whether he owned the property where he lived, even though he had answered him a good many times that he did own it.  At one time Captain Rewell bought a load of coal of the witness and paid for it, and next day he went into witness's office and said, "I believe I owe you for a load of coal, don't I?" seeming to have overlooked the fact that he paid for the coal the day he bought it.

J. H. Reed was a tenant of Captain Rewell.  On two occasions he paid the rent to Rewell, and Rewell again asked him for payment.  In each of these instances a receipt was given by Rewell to the witness when the money was paid.  The facts as to one of these instances seems to be that Rewell went into the place of business of the witness, the rent was paid to him and he signed a receipt, put the money in his pocket, and when he went home, being unable to find the money about his person, came back, thinking that it must be that, as he had remained and talked with the witness some time, he had given the receipt without actually receiving the money.  When he went back, however, on being assured that he had been paid, he made further investigation and found the money in his pocket.  This

would perhaps indicate that he was not as careful as he would have been once, but surely it is not a very remarkable thing and is far from showing that one is without testamentary capacity. On the other occasion, several days intervened between the time of the payment and the call made by Rewell for the rent, which would indicate, certainly, that the memory of Captain Rewell was not first-rate, yet it can hardly be said that one who forgets that money has been paid to him is necessarily of unsound mind. This witness says that within the last year of Captain Rewell's life he told him of his property, telling him of his real estate, his notes and his stocks. This witness borrowed money of him and transacted business with him up to nearly the time of his last sickness.

Olive A. Allen tells of his having for a long time occupied a pew well to the front of the church which both he and she attended. After his marriage to his third wife he took a pew further back in the church which, she says, was in deference to the wishes of his wife. We see nothing in this to indicate either undue influence or unsoundness of mind. She tells of his being forgetful at the time of the last sickness of his second wife; that, after being told that she must be kept quiet, he would seem to forget it to the extent that he would go and speak to his wife when she ought to have been let alone and when he had been told she ought to be let alone.

Dr. H. C. Eyman, at present superintendent of the state hospital for the insane at Massillon, and formerly holding the same position in the hospital at Cleveland, an expert in mental diseases, was called in consultation with Dr. Bortz, the regular attending physician of Captain Rewell, a few days before his death. He found him then suffering from an acute outbreak of *senile dementia*. Dr. Bortz himself testifies that in his last sickness he was suffering under delusions and was very considerably out of his mind, and of this there can be no doubt.

Mrs. Jane Sinclair, of Clinton, Michigan, a sister of Captain Rewell, and Mrs. Mary Blanchard, a daughter of Mrs. Sinclair, each testified as to a visit made by him, in Michigan, during his widowerhood after the death of his second wife, in which he seemed very sad and depressed, and of a visit made to them

shortly after his marriage to her who is now his widow, and it is clear that at the time of this last visit he manifested great pride in his new wife, and asked them frequently if they didn't think he had just the right woman for a wife, and if they thought by any possibility he could have done better, and the like.

The testimony of these and of all the witnesses shows that during the last years of his life Captain Rewell's mental faculties were impaired; that his memory was not as strong as it had been; that he was suffering, to some degree, at least, from what the medical men call *senile dementia*, a term which sounds more fearful than it really seems to be when we get the explanation of the physicians as to what is included in the term, because they say the term includes all those symptoms of mental impairment which are incident to old age. Indeed, from what is said about it, it would seem that very few men who have passed the age of sixty years but what, in greater or less degree, are afflicted with *senile dementia*.

When the testimony of all the witnesses who testified that, in their judgment, Captain Rewell, at the time this instrument was executed, was without testamentary capacity, is weighed with that of the other witnesses, we think it clear that the jury reached a wrong conclusion in their verdict in this case.

The man who wrote the will, H. D. Messick, was a complete stranger to Captain Rewell. Rewell called upon him at the bank and asked him to draw his will. He was accompanied by his wife. Without any suggestion from anybody made at the time, he enumerated his property, omitting nothing except certain mining stock of very little value, which, upon his wife mentioning it, he disposed of in his will. That he then remembered in what his property consisted, practically all of it, seems clear from the testimony of this witness, and that he remembered those who would naturally be the objects of his bounty is clear from the will itself. He did not forget Mrs. Warden, for he made a bequest to her; he did not forget his son George, for he made a large bequest to his wife; he did not forget his wife, for he made so large a bequest to her that for that reason it is sought to set aside this will.

Mr. Keith, who was a witness to the will (Mr. Messick being the other witness), saw nothing about Captain Rewell to indicate want of mental capacity and memory. Witnesses who knew him during the years of his business life and up to the end of his life testified as to his mental faculties in such wise as to clearly indicate testamentary capacity. The fact is that up to the close of his life, or, in any event, up to the time of his last sickness, he took charge of his own business interests, which were considerable. It seems clear that he did not forget that he owned the several pieces of real estate which he did own, nor forget when the rent became due from the tenants occupying such real estate, nor did he forget the bills which he owed. It is true that in one or two instances he forgot that such bills had been paid, but he 'remembers that such bills had been contracted.

We are under the impression that the jury were influenced in coming to their verdict by a feeling that Captain Rewell had not done the fair thing by Mrs. Warden. We do not undertake to say that Mrs. Warden had rightly forfeited, by anything which she or her husband had done, the affection of her father. So far as appears, she seems to have been to him what a daughter should have been, but it was not unnatural that Captain Rewell, though of perfectly sound mind, should have seen fit to cut her off with the little pittance which he did because of what he believed to be the bad treatment which he had received from her husband.

If Captain Rewell had testamentary capacity, it was his right to do what he would with his own. It is a mistaken notion that children have a right to dictate what the parent shall do with his own property, and surely it is no part of the duty of a jury to determine that property shall not go as a testator desires that it should, simply because they think it would have been more equitable and just to have made a different disposition of the property.

The courts of the different states and of the United States have had occasion again and again to discuss this question of testamentary capacity.

In support of what has been said about undue influence, attention is called to the case of *Mears* v. *Mears*, 15 Ohio St., 90, where it is held that the fact that one who is benefited by the will was so situated that he might have exercised great influence over the mind of the testator, raises no presumption that undue influence was exercised.

In *Monroe* v. *Barclay*, 17 Ohio St., 302, it is said that undue influence or fraud, to invalidate a will, must appear to have had some effect on the very act of making the will, by imposing a restraint upon the independent wishes and judgment as to disposition of property.

In the case of *Wise* v. *Foote*, 81 Ky., 10, the fifth clause of the syllabus reads:

"Influence obtained by proper persuasion and argument, or by mere appeals to the affection is not undue influence in a legal sense."

On the question of testamentary capacity, it is well settled that less mental strength is required for the execution of a valid will than is required for the making of contracts with parties whose interests are adverse to him whose mental capacity is being investigated.

In the case of *Wilson* v. *Mitchell*, 101 Pa. St., 495, there is an opinion by Mr. Justice Trunkey, who announces the law as we understand it to be. On page 502 and following of the opinion in that case, this language is used:

"A man of sound mind and disposing memory is one who has a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty. It is not necessary that he collect all these in one review. If he understands in detail all that he is about and chooses with understanding and reason between one disposition and another, it is sufficient for the making of a will.  *  *  *  If from any cause he is so enfeebled in mind as to be incapable of knowing the property he possesses; of appreciating the effect of any disposition made by him of it; and of understanding to whom he intends to bequeath it, he is without the requisite testamentary capacity.  *  *  *  He must

have memory.   A man in whom this faculty is totally extin-
guished can not be said to possess understanding to any degree
whatever, or for any purpose.   But his memory may be very
imperfect; it may be greatly impaired by age or disease.   He
may not be able at all times to recollect the names, the persons
or the families of those with whom he had been intimately ac-
quainted; may at times ask idle questions, and repeat those
which had before been asked and answered; and yet his under-
standing may be sufficiently sound for many of the ordinary
transactions of life.   He may not have sufficient strength of
memory, and vigor of intellect, to make and to digest all the
parts of a contract, and yet be competent to direct the distribu-
tion of his property by will.   This is a subject which he may
possibly have often thought of; and there is probably no
person who has not arranged such a disposition in his mind be-
fore he committed it to writing.   *   *   *   The question is not
so much what was the degree of memory possessed by the tes-
tator as this—had he a disposing memory?   Was he capable
of recollecting the property he was about to bequeath; the man-
ner of distributing it and the objects of his bounty?   To sum
up the whole in the most simple and intelligent form—Were
his mind and memory sufficiently sound to enable him to know,
and to understand, the business in which he was engaged at the
time when he executed the will?   *   *   *   Neither age, nor
sickness, nor extreme distress or debility of body will affect the
capacity to make a will if sufficient intelligence remains.   The
failure of memory is not sufficient to create the incapacity,
unless it be total, or extend to his immediate family or prop-
erty.   The want of recollection of names is one of the earliest
symptoms of the decay of the memory; but this failure may
exist to a very great degree, and yet 'the solid power of the
understanding' remain."

On page 504, in the same case, this language is used, speak-
ing of the testator:

"The general character may be learned from one of the
most intelligent (of the witnesses)—Mr. Dunlap; he knew
Dougal (the testator) in 1815, studied surveying with him in
1835, was an intimate friend, was very frequently with him in
the line of their business, and when Dougal ceased surveying
he turned his business over to the witness.   He testifies that
Dougal was a strong-minded man, wrote rapidly and well, and
was very tenacious of his opinions; a tender and feeling man,
always glad to meet his old acquaintances of childhood; that in

the last years of his life his mind was not so vigorous; that in 1880 his memory appeared to be right on transactions in the prime of his life; on these he conversed as well as ever; did not talk about recent transactions, but he asked about witness' wife; asked the same question over several times, as if he had forgotten he had asked it before; saw nothing like insanity about him, and never heard an irrational or insane expression by him, and observed no hallucination or delusion, and the witness thinks that under solicitation and well-wishers, Dougal would have readily changed his mind, and doubts if he had capacity to make a will. Surely this testimony does not show want of testamentary capacity.''

In this case the testator was over one hundred years old at the time the will was made; he was blind and partly deaf; his mind was treacherous as to recent events; he would repeat the same things several times, and slept almost constantly. In his prime his mental and physical vigor had been remarkable and he had been observant of the proprieties of life, while in old age his vigor abated and he became extremely filthy in his habits. It was held that there was not evidence to show want of testamentary capacity.

A large number of authorities, cited and quoted from in the brief of the plaintiff in error, are to the same effect as those hereinbefore quoted. *Crolius* v. *Stark*, 64 Barb., 112; *Yoe* v. *McCord*, 74 Ill., 33; *Montague* v. *Allan*, 78 Va., 592 (49 Am. Rep., 384).

The questions raised upon the admission and rejection of evidence are numerous and have been carefully examined.

We are not prepared to say that there was not error in the ruling of the court upon some of the questions of evidence, and, if the case is retried, we suggest that the better way to ask as to the opinion of non-experts in reference to the mental condition of the testator would be to base the opinion upon the facts testified to by the non-expert witnesses.

The hypothetical question put to the physicians is very long and complicated, and, we think, can be greatly improved upon when the case is again tried. We are not prepared, however, to say that the plaintiff in error was prejudiced by the ruling upon this question of evidence.

The charge of the court, on the whole, seems to us a fair statement of the propositions of law discussed, but. under the evidence, we think there was no occasion to say anything to the jury on the question of what constitutes undue influence, for, as has already been said, we find no evidence tending to show that any influence which in any proper sense can be said to have been undue was exercised by anybody upon the testator, and hence, what was said in that regard should have been omitted.

It is possible that we should not feel justified in reversing the case on account of what was said in the charge upon that subject, because it is the law as we understand it to be, but it should have been omitted for the reasons already given.

The judgment of the court below is reversed for error in overruling the motion for a new trial and because the verdict is not sustained by the evidence.

*Goulder, Holding & Masten,* for plaintiff in error.

*E. J. Pinney, W. H. Boyd* and *Henderson & Quail,* for defendants in error.