JEREMIAH RING *et al.*

*v.*

BRIDGET LAWLESS *et al.*

*Opinion filed June 19, 1901.*

1. APPEALS AND ERRORS—*when objection that bill is multifarious is waived.* An objection that a bill is multifarious is waived, on appeal, where the defendants, after the overruling of a demurrer upon that ground, filed answers to the bill upon the merits and consented to the submission to a jury of the issues made by the bill and answers, which issues were heard by three juries.

2. LACHES—*laches cannot. be imputed before the right of action exists.* Those persons who, in case a grantor dies intestate, will inherit his lands have no right, during the life of the grantor, to sue at law or in equity to avoid his deeds, and hence *laches* with respect to such suits cannot be imputed to them during the grantor's life.

3. WITNESSES—*who are competent to express opinion as to the mental status of testator.* Witnesses who have resided for many years in the same neighborhood with the testator, were well acquainted with him, had seen him frequently and often talked with him and observed his actions and conduct, are competent to express an opinion as to his mental condition.

4. EVIDENCE—*that the testator was never allowed to transact business alone is a competent circumstance.* Opinions of witnesses that a testator was not competent to transact ordinary business affairs are properly admitted in evidence although they had never seen him transact any business, where they testify that they had observed he never transacted any business but that his wife or some member of the family always acted in such affairs, even though the testator was present and was the party directly interested.

5. SAME—*when alleged error in refusing to admit evidence cannot be considered.* Alleged error of the trial court in refusing to admit in evidence, for the purpose of impeachment, a transcript of the testimony given by a witness at a former hearing cannot be determined on appeal, where the record does not contain such transcript.

6. WILLS—*ability to transact ordinary business is not the test of testamentary capacity.* While it is true that one who has mental power to understand and transact ordinary business has capacity to make a will, yet the want of ability to transact ordinary business does not necessarily show incapacity to execute a valid will.

7. SAME—*meaning of phrase "sound mind and memory."* The meaning of the phrase "sound mind and memory," as used in the statute, is that the testator shall possess sufficient mental power and understanding to comprehend what property he has to dispose of,

the natural objects of his affection and bounty, and to understand the nature of his acts and the effect his will would have upon the natural objects of his bounty and affection.

8. SAME—*both sound mind and sound memory are not essential to testamentary capacity.* It is error to instruct the jury in a will case that "a sound mind and memory are both necessary qualifications, under the law, for making a valid will, and if one of those necessary elements was wanting * * * it is not valid."

9. DEEDS—*test of mental capacity to make a deed.* The test of mental capacity to make a valid deed is that the grantor be capable of understanding, in a reasonable manner, the nature and effect of the act in which he is engaged, which capacity may be shown by proof that he is capable of transacting ordinary business affairs involving his interests.

10. SAME—*one incapable of transacting ordinary business cannot make a valid deed.* If a grantor is shown by the evidence to be lacking in that degree of comprehension which would enable him to protect his own interests in the transaction of ordinary business he is incapable of understanding the nature and effect of his act in disposing of his land to another by deed.

11. SAME—*when grantor is incompetent to make a deed.* A grantor is incompetent to make a deed if the evidence shows he was a man of feeble mentality, childish in speech and deportment, lacking in mental power to carry on a connected conversation on any subject, and unable, though a farmer, to comprehend the values of farm products or stock, that he was regarded by his family as incapable, and submitted himself to their control and permitted property standing in his name to be controlled and sold by his wife.

APPEAL from the Circuit Court of Scott county; the Hon. O. P. THOMPSON, Judge, presiding.

Jeremiah Ring, Sr., died March 17, 1894, leaving him surviving Ann Ring, his wife, three sons, Jeremiah, Jr., James and William, and two daughters, Bridget Lawless and Ellen Woodall. A writing purporting to be the last will and testament of said deceased was presented to the county court of Scott county and admitted to probate. The will bequeathed to each of said daughters of the testator the sum of five dollars, and bequeathed and devised all his real property and the remainder of the personal property owned by him to said Ann Ring, his wife, for and during her natural life, with power to make ab-

solute disposition of it, with remainder over of all undisposed property to the said three sons-of said testator. The will was dated May 21, 1890. After the testator had signed the will, he and Ann, his wife, in the year 1893 executed three deeds purporting to convey all the real estate of which the deceased was the owner. One of these deeds purported to convey a tract of land to said James Ring for a stated consideration of $600. Another purported to convey two lots in the city of Winchester to said William Ring and James Ring for a stated consideration of $800. The other of said deeds purported to convey certain tracts of land to Jeremiah, Jr., and William Ring, in consideration of one dollar and natural love and affection. In May, 1894, a conservator was appointed for said Ann Ring. She died in 1896, during the pendency of this proceeding and without having disposed of any real estate after the death of her husband.

This was a bill in chancery in the circuit court of Scott county, to the October term, 1895, by the said widow, Ann Ring, by her conservator, and the said two daughters, Bridget Lawless and Ellen Woodall, against the three sons of said Jeremiah Ring, Sr., deceased, to contest the will of said deceased and to set aside and vacate the three deeds executed after the making and signing of the will, and also to set aside and vacate five other deeds previously executed by the said Jeremiah Ring, Sr., and Ann Ring, his wife, on the ground the said Jeremiah Ring, Sr., was lacking in mental capacity to execute the said will and each and every of said deeds, and for the further alleged reason the execution of the said will and each of said deeds was procured by the undue influence exercised by the said sons of said Jeremiah, Sr., who, respectively, were the beneficiaries under said instruments. The said five deeds referred to in the bill as having been made prior to the making of the will were certain deeds signed by said Jeremiah Ring, Sr., and Ann Ring, his wife, as follows: One dated March 20, 1867,

purporting to convey certain lands to said William for the stated consideration of $500; one dated March 20, 1867, purporting to convey certain lands to Jeremiah, Jr. (and in case of his death without "heirs," to James and William Ring,) for a stated consideration of $500; one dated February 20, 1873, purporting to convey certain other tracts of land to Jeremiah, Jr., for a stated consideration of $500; one of the same date, acknowledged July 28, 1873, purporting to convey certain other tracts to James for a stated consideration of $500, and one dated March 4, 1875, purporting to convey still other lands to James for a stated consideration of $1000. All of said five deeds reserved the possession and use of the lands to the grantors for and during their natural lives, except the deed dated March 4, 1875. The bill alleged no valuable or money consideration was paid by any of the grantees in any of the deeds sought to be avoided by the bill, and that said Jeremiah, Sr., at and before the date of the first of said conveyances, to-wit, March 20, 1867, and from thenceforth, continuously, during the remainder of his life, was of unsound mind and mentally incapable of executing a valid deed or will.

A demurrer general and special was presented to the bill. The grounds of demurrer were, the bill was multifarious in that it presented distinct matters and causes, and that it should not be entertained as to the conveyances of 1867, 1872, 1873 and 1875 because of *laches*, and that the allegations as to the charges of the exercise of undue influence were insufficient. The demurrer was sustained on the latter of these grounds and overruled as to the others. The bill was amended in respect of the charge of undue influence, and the defendants each made answer thereto. Replications were filed, and the court, without objection on the part of any of the parties, caused issues of fact out of chancery as to the validity of each of said eight deeds, and an issue at law under the statute whether the writing produced was the will

of said deceased, Jeremiah Ring, Sr., to be submitted to the same jury for trial. These issues had been submitted twice before to juries. The jury by whom the cause was first heard were unable to agree. On the second hearing the findings were the said Jeremiah Ring was mentally incapable of making a valid deed or will. At the last hearing the jury returned special findings that said Jeremiah Ring, Sr., was lacking in mental capacity to execute each and every of the said deeds, and that he was unduly influenced in making each and every of them, and that the paper writing purporting to be the last will and testament of the said Jeremiah Ring, Sr., was not the will of the alleged testator. The chancellor set aside the finding that the deeds were the result of undue influence exercised over the said grantor, but otherwise accepted the findings of the jury as to the deeds and overruled a motion to grant a rehearing of the other issues, and entered a decree setting aside and vacating the deeds and the will, and declaring all of the property involved to be intestate property and belonging to the parties complainant and defendant, as tenants in common, (said Ann Ring, widow of said deceased, having departed this life during the pendency of the proceeding,) and further entered a decree in partition accordingly. This is an appeal by the sons, Jeremiah, Jr., William and James Ring, to reverse the decree.

H. G. WHITLOCK, and JAMES A. WARREN, for appellants.

MARK MEYERSTEIN, and J. M. RIGGS, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The theory of the bill is, that said Jeremiah Ring, Sr., was, at and before the year 1867, (the date of the first conveyance sought to be avoided,) and from thenceforth, continuously, during the remainder of his lifetime, lack-

ing in mental power to make a valid disposition of his property, either by deed or will; that during that period of time the appellant Jeremiah, Jr., received two deeds for real estate from him, the appellant James three deeds, the appellants William and James one deed, the appellants Jeremiah, Jr., and William one deed, and the appellant William one deed; that all of said parties claim as devisees under the alleged will of said Jeremiah, Sr. The alleged ground of invalidity of each of the deeds and of the will is the same, viz., the lack of mental capacity of the grantor and testator. The appellants (defendants to the bill) were alike interested in the provisions of the will, and the ground of attack upon the validity of the will and upon the deeds was the same. The appellants William and James were jointly interested in the deeds of date January 10, 1893, and the appellants Jeremiah, Jr., and William had like joint interest in the deed of date June 8, 1893. The deed of March 20, 1867, to Jeremiah, Jr., was so conditioned as to create a possible reversionary interest in James Ring, and the deed of February 20, 1873, to Jeremiah, Jr., was so conditioned as to create a possible reversionary interest in James and William.

It cannot be urged in this court the bill is multifarious. The appellants did not abide by their demurrer but filed answers to the bill upon its merits, and consented to the submission of the issues of fact so made by the bill and answers to a jury, and these issues have been three times heard by as many different juries. The objection the bill is multifarious must be regarded as waived.

Prior to the death of their father, the complainants below, the appellees here, had no legal interest in his property and could not have been heard in the courts to question the validity of instruments executed by him. They brought this bill in due season after his death, and *laches* cannot be imputed to them on the ground the deeds were executed many years before the death of their father. *Laches* is neglect or omission to assert a right.

(12 Am. & Eng. Ency. of Law, 533). Those persons who, in case a grantor shall die intestate, will inherit his lands have no present right during the life of the grantor, and cannot institute actions at law or suits in equity to avoid such deeds or cancel them while the grantor is living. (*Baldwin* v. *Goulde*, 88 Hun, 115; *Borders* v. *Hodges*, 154 Ill. 498). Hence *laches* cannot be imputed to them until a legal right attaches in them to act.

The complaint non-expert witnesses who, as appellants allege, had never seen the testator transact any business, and who, as is alleged, gave no facts to the jury touching his capacity to transact the ordinary business affairs of life, were permitted by the court to give opinions as to his capacity to transact such affairs is not well grounded. This objection referred to a number of witnesses who had resided for many years in the same neighborhood with the testator, were well acquainted with him, had seen him frequently during the period of acquaintanceship and often talked with him and observed his actions and conduct, and who were allowed to express to the jury their belief and individual opinion as to his capacity to transact the ordinary business affairs of life. These witnesses were, respectively, competent to express an opinion as to the mental status of the testator, and it was not error to permit them to so testify before the jury. (*Keithley* v. *Stafford*, 126 Ill. 507; *Jamison* v. *People*, 145 id. 357; *Craig* v. *Southard*, 148 id. 37.) It is true, a number of them testified they had never seen the testator transact any business matter. They, however, testified they had observed that he did not transact such matters, but that his wife or some other member of the family always moved and acted in such affairs, even when the testator was present and was the party directly interested in the transaction. The fact that under such circumstances the members of the family treated the testator as incapable to act, and that he submitted and allowed them to act for him, was significant, and as

competent as if the witnesses had testified they had observed the testator in unsuccessful attempts to transact business affairs.

The appellants introduced the official reporter of the court as a witness, who produced what he testified was a correct transcript of the evidence given by one Lawson when a witness on the former hearing of the cause, and appellants offered the same in evidence for the purpose of impeaching the testimony given at this hearing by the same witness. It is complained the court refused to permit such transcript to be introduced. The record does not contain the official transcript, and, aside from all other questions as to the admissibility of that item of evidence, the complaint must be overruled for the reason we cannot, in the absence of the transcript, determine whether it was proper to be received in evidence.

Instructions Nos. 3, 7, 11 and 13 given in behalf of the appellees were to the effect that unless the jury believed, from the evidence, the testator had sufficient mental capacity to enable him to transact the ordinary business affairs of life he could not make a valid will. In buying and selling property, adjusting accounts, collecting or paying out moneys, borrowing money or making loans, and in other business transactions of life, important considerations arise which are not involved in the disposition of property by will. A will does not take effect during the lifetime of the testator, and for that reason the act of making a will does not interfere with the use of the property by the testator. He may enjoy or dispose of the property as fully after as before making the will. His personal convenience and physical comfort are not to be affected by an imprudent or ill-judged provision in his will as to the enjoyment of the property by others after he shall have no further need of its use. A sale of property becomes operative during the lifetime of the seller, and on the consummation of the transaction he must surrender possession of the property to the buyer

and at once forego all further right to enjoy the use or benefit thereof. It then becomes important for him to understand and comprehend the value of that which he is to receive for that which he parts with by the sale, and to determine whether it is to his interest to retain that which he has, or to deprive himself of it and receive some other thing or representative of value in its stead. The buyer will exercise his judgment, knowledge, experience and shrewdness to the end that he may become the owner of the property of the seller on terms the most favorable possible to himself. The vendor must have mental strength and understanding to compete with his business antagonist and protect his own interest, but the testator has no antagonist to meet and no necessity to consider whether he will be benefited or injured by the act in which he is engaged. The ordinary business transactions of life involve a contest of reason, judgment, experience, and the exercise of mental powers not at all necessary to the testamentary disposition of property.

It has often been said by this and other courts that a person who has mental power to understand and transact ordinary business has capacity to make a valid will. The truth of this cannot be doubted, but it must not be understood to mean that that degree of mental power and vigor is requisite to testamentary capacity. Mental perception and power to think and reason of a lesser degree may be all that is requisite to the full understanding of everything involved in the execution of a will. The want of that degree of understanding necessary to enable one to transact the ordinary affairs of life does not, necessarily, show incapacity to execute a valid will. It is stated in Jarman on Wills (5th Am. ed. 95,) that "the same degree of capacity is not requisite to the making of a valid will that is necessary to the making of a contract or to manage the ordinary business of life." In *Greene* v. *Greene,* 145 Ill. 264, we said (p. 276): "If, therefore, the degree of mentality required in the making of

a valid will is no greater than that exhibited in such or-
dinary affairs, it would, as before said, logically follow
that he who conducted himself according to the stand-
ards observed by the mass of the people in such affairs
would be capable of executing a testamentary disposi-
tion of his property.    But it does not necessarily follow
that the converse of the proposition must also be logical
or true.  There are undoubtedly many cases, as in *Harvey*
v. *Sullens*, 46 Mo 147, and in this case, where it might be
applicable or at least would do no harm; but we are of
opinion, both upon authority and reason, that it cannot
be laid down as a rule of law applicable to cases of the
contest of wills."  In *Craig* v. *Southard*, *supra*, we said
(p. 45): "The real question submitted to the jury, how-
ever, is, not whether the party had sufficient mental ca-
pacity to comprehend and transact ordinary business,
but did he, at the time of making the instrument purport-
ing to be his will, have such mind and memory as enabled
him to understand the particular business in which he
was then engaged.   (1 Redfield on Wills, 123, 124; *Camp-
bell* v. *Campbell*, 130 Ill. 466; *Greene* v. *Greene, supra;* *Stevens*
v. *VanCleave*, 4 Wash. C. C. 262; *Harrison* v. *Rowan*, 3 id.
580.)  If he did,—if he was able to remember who were
the natural objects of his bounty, recall to mind his prop-
erty and make disposition of it understandingly, accord-
ing to some purpose or plan formed in his mind,—he was
possessed of testamentary capacity, and with such ca-
pacity, uninfluenced improperly by others, he may make
valid testamentary disposition of his estate."  In *Taylor*
v. *Cox*, 153 Ill. 220, we held ability to transact the ordi-
nary affairs of life was not the true test of testamentary
capacity.   The same doctrine is announced in 25 Am. &
Eng. Ency. of Law, 970, and many cases are cited in
note 2 in support of the text.   It is manifest these in-
structions may have misled the jury to erect a higher
standard of testamentary power than the law requires,
to authorize the testator to execute a valid will.

Another error, of like nature, permeated the instruc-
tions. Instruction No. 15 given in behalf of the appellees
is as follows:

"You are further instructed that a sound mind and
memory are both necessary qualifications, under the law,
for making a valid will, and if one of those necessary
elements was wanting at the time of making said will
it is not valid."

Instruction No. 7 was to the effect that the jury might
consider whether the "mind and memory, or both or
either, were so affected" as that the testator was men-
tally incapable, etc.

In *Daly* v. *Daly*, 183 Ill. 269, we said (p. 272): "Sec-
tion 1 of chapter 148 of the Revised Statutes, entitled
'Wills,' relates to the competency of a testator; and as
to his requisite mental capacity the expression of the
statute is, such testator shall be of 'sound mind and
memory.' Long prior to the enactment of the statute
the legal meaning of the phrases 'sound mind and mem-
ory,' 'sound and disposing mind and memory' and 'sound
and disposing mind' had become well established. They
were convertible terms, and were used interchangeably,
to denote that degree of mental strength and power
deemed requisite to testamentary capacity. Absolutely
sound and perfect mental faculties were not requisite to
such capacity, nor was such the interpretation of the
word 'sound' as employed in any of such phrases, but the
phrases were employed as expressive, in their entirety,
of the degree of mental power and vigor which a testator
should possess in order to be competent to dispose of
his estate by will. In *Yoe* v. *McCord*, 74 Ill. 33, we said
(p. 40): 'The expression 'sound mind and memory,' as
used in the statute, we conceive means nothing more
than the words 'sound and disposing mind,' frequently
employed in reference to this subject. * * * Little-
ton makes the terms 'of non-sane memory,' '*non compos
mentis*,' and 'not of sound memory,' convertible terms.—

2 Co. Litt. sec. 405.' * * * In the investigation of the question of the mental capacity of a testator, evidence tending to show his memory had become defective and unsound is proper for the consideration of the jury. Every faculty of the mind may be the subject matter of testimony in order that the jury may have the necessary information and knowledge to enable them to determine whether the testator possessed that degree of mental strength, power and understanding which, in the meaning of the statute, constitutes a 'sound and disposing mind or 'sound mind and memory.' Evidence that the testator's memory was naturally weak or had become impaired and defective, and the degree of such weakness or impairment, is proper for consideration, together with all other testimony relative to the mental qualities and faculties of the testator. But when all such evidence has been produced, the matter for decision is not the strength of the single faculty of memory possessed by the testator, but whether that general condition of mental strength exists which is denominated by the statute 'sound mind and memory.'"

In the case last cited we held the meaning of the phrase "sound mind and memory" is, that the person under consideration possesses sufficient understanding and mental power "to comprehend what property he has to dispose of, the natural objects of his affection and bounty, to understand the nature of his acts, and the effect his will would have on the natural objects of his bounty and affection." It was error to advise the jury, as was done in said instructions Nos. 7 and 15, that both a sound mind and a sound memory were necessary to mental capacity to execute a will. The verdict rendered by the jury that the writing produced, purporting to be the will of said Jeremiah Ring, Sr., "is not the last will and testament of the said Jeremiah Ring, Sr.," has the same force and effect as the verdict of a jury in an action at law. (*Rutherford* v. *Morris*, 77 Ill. 397; *Long* v. *Long*, 107 id. 210.) It

appearing to us that error crept into the charge of the court to the jury and may have contributed to the verdict, it becomes our duty to reverse the decree so far as it is based upon that verdict. *Guild* v. *Hull*, 127 Ill. 523.

The verdicts rendered by the jury that the said Jeremiah Ring, Sr., had not sufficient mental power and capacity to execute the said eight several deeds in question and that he was unduly influenced by the appellants in making each of said deeds, were upon feigned issues arising out of chancery, and were advisory, merely, to the court. The chancellor did not accept the findings that the deeds were the result of the exercise of undue influence on the part of the appellants, and refused to be controlled by such findings. The findings that the said Jeremiah Ring, Sr., was wanting in mental power and ability to execute the said deeds coincided with the conclusions reached by the chancellor as to the weight of the evidence. The decree that the deeds be vacated and canceled is the result of the application by the chancellor of the principles of law applicable, in his judgment, to the facts which he believed to be established by the preponderance of the evidence. It is, therefore, unimportant to consider the complaints that the court fell into error in instructing the jury as to the law applicable to these feigned issues. (*Guild* v. *Hull, supra; Kinnah* v. *Kinnah*, 184 Ill. 284.) The decree as to this branch of the case is to be regarded by us as other ordinary decrees in equity. The inquiry, then, is, is the decree as to the deeds supported by sufficient competent testimony and justified by the application of correct legal principles to the state of case made by the proofs? The only complaints preferred to the action of the court in admitting testimony to be introduced are those which we have hereinbefore investigated and found to be groundless.

The test of mental capacity necessary to enable a grantor to make a valid deed is, that he is capable of understanding, in a reasonable manner, the nature and

effect of the act in which he is engaged. (*Lindsey* v. *Lindsey*, 50 Ill. 79; *Wiley* v. *Ewalt*, 66 id. 26; *Titcomb* v. *Vantyle*, 84 id. 371; *Willemin* v. *Dunn*, 93 id. 511; *English* v. *Porter*, 109 id. 285; *Perry* v. *Pearson*, 135 id. 218; 16 Am. & Eng. Ency. of Law,—2d ed.—624.) That he has such capacity may be shown by proof that he is capable of transacting ordinary business affairs wherein his interest is involved. If he has mental power to comprehend and protect his own interest in such ordinary business affairs, the tribunal to whom the question is submitted may regard him as competent to understand the nature and effect of the act of disposing of his property by deed. If he is lacking in that degree of comprehension, it may well be regarded he is incapable of understanding the nature and effect of the act of disposing of his land to another.

Jeremiah Ring, Sr., came to Scott county, Illinois, as early as 1854. His occupation was that of a farmer, and for a few years he lived, with his wife and children, on a small forty-acre farm. The title to the forty-acre tract of land was in him, and the other tracts of land in question were subsequently bought, from time to time, and deeds taken in his name. He resided in Scott county from 1854 until the date of his death, March 17, 1894. Thirty-five witnesses were examined in behalf of the appellees on the issue of the sanity or mental ability of said Jeremiah Ring, Sr., during all the period of his life after coming to Scott county, which was thirteen years prior to the execution of the earliest of the deeds here brought into question. A greater number of witnesses were introduced for the appellants on the same issue. The chancellor saw these witnesses and heard them testify, which, as we have frequently remarked, gave him opportunities for correctly determining as to the weight of their testimony superior to that enjoyed by a court of review. The greater number of the witnesses who testified in behalf of the appellees had for many years,— some of them for thirty years,—been neighbors of Mr.

Ring, Sr., were intimately acquainted with him, and had had frequent and ample opportunity to observe his actions and conduct and judge of his mental capacity, and they testified it was their belief he was mentally incapable of transacting ordinary business affairs,—not that he was insane or that his mind had become impaired by age or disease, or otherwise, but that he was naturally deficient in mental power, by nature weak and feeble in mind. The testimony as given by these witnesses is too voluminous to be treated in detail. Summarized, it seemed to justify the chancellor in concluding that said Jeremiah Ring, Sr., was a man of feeble mentality, childish in speech and deportment, lacking in mental power to carry on connected conversation on any subject, unable, though a farmer, to comprehend values of farm products or domestic animals or to understand and transact even the most ordinary business matters, regarded by his family as incompetent and incapable, and that he submitted himself to control, and permitted the property which stood in his name to be controlled, bought, sold and bargained by his wife. Many of these witnesses testified to instances of the disposition of the products of the farm, cattle, sheep, hogs and other property which stood in his name, by sales and exchanges, in which transactions his wife or some member of the family carried on the conversation, concluded the contract and received the money, while he stood by without participating in the transaction. Other of the witnesses had performed labor on the farm, such as cutting wood, making rails, clearing land, plowing, shocking corn, sowing wheat, building fences, threshing grain, repairing the farm buildings, etc., and they testified that they were employed, controlled and paid by Mrs. Ring or some member of the family of Mr. Ring; that rents accruing from farm lands and from a dwelling house in Winchester, in said Scott county, the title to which was in the name of Mr. Ring, Sr., were not contracted for or collected by him, but by his wife or

some other member of the family,—usually the wife, or some of the children acting under her directions. The horse farrier testified that Mrs. Ring employed him to render services to the horses and that she paid him. The carpenter, that she directed him as to the repairs on the farm buildings and that she paid him for his work. The banker, that though the bank account stood in the name of Mr. Ring, Sr., the deposits, save in one instance, were made by the wife and were paid out on checks drawn by her,—the circumstances which attended the single deposit made by him, and his remarks at the time, indicating he delivered the money as one acting under the directions of another. The crier at a sale of the personal property on the farm when the family contemplated moving from the farm to Winchester was employed by Mrs. Ring, controlled and directed by her, and, aside from going out into the fields and lots to bring in the stock to be sold when directed by his wife, Mr. Ring did not participate in any way in the sale of the property, though it all was sold as being his property. The blacksmith testified that Mrs. Ring came to his shop to have repairs made, and though Mr. Ring was usually with her, she controlled the work and paid the charges, while the husband, as the smith testified, "stood around and talked more like a boy than a man." The grocers and merchants testified, that though the accounts ran in the name of Mr. Ring the trading and payments were made by Mrs. Ring. One of the tradesmen testified that while the family was living in Winchester Mr. Ring would sometimes come for groceries and say, "Mother sent me to get" certain things; that he would bring a basket in one hand and the exact amount of change in the other to pay for what he was directed to get, or, if he did not have the money to pay, he would say, "Mother said she would stop and pay for it." He occasionally went to saloons for drinks and the bills therefor were usually paid by his wife. At times he would have a few coins tied up in the

corner of a handkerchief, and one witness testified that on one occasion Mr. Ring called him aside and asked him to untie the handkerchief and select the coin needed to pay the bar-keeper, as Mr. Ring did not know the value of any coin. A witness who had worked on the farm by the month and lived in the family testified Mr. Ring could not drive a reaper or mower and could not put together the common implements in use on the farm. The agent of the express and railroad companies testified that the freight and express packages which came in his name were taken out by some member of the family and the charges paid by them, and that Mr. Ring, though usually present, took no part in the transaction whatever. The testimony tended strongly to show that it was the custom in the family to have some member thereof attend Mr. Ring whenever he went away from the home place. It was a common expression of the witnesses that he appeared, acted, talked and was treated "more like a boy than a man."

Many of the witnesses who testified on behalf of the appellants were of the opinion Mr. Ring was competent to transact ordinary business. Cross-examination, in most instances, however, disclosed but a few isolated instances of business transactions had with him, though the evidence covered the period of more than thirty years of his life, and in the case of a number of the witnesses the cross-examination brought out the history of transactions which indicated that he acted, talked and was treated by his wife as being incapable of taking part in business affairs.

We reverse a decree on the ground it was not warranted by the proof, only in the event it is clear the chancellor fell palpably into error in adjudging as to the weight of the testimony. (*Patterson* v. *Scott*, 142 Ill. 138; *Higgins* v. *Wisner*, 170 id. 220.) The record does not disclose that such is here the state of the case.

The insistence of counsel the deeds should not be vacated except upon re-payment of a proportionate part of the consideration named in the deeds, and for like proportion of the value of improvements made on the land by the grantees, is not well grounded.  Though each of the deeds reserved the use and enjoyment of the lands to the grantors for life, the chancellor found the grantees enjoyed the lands without the payment of rent during the lifetime of said Jeremiah Ring, Sr.  The only testimony tending to show payment of rent during the lifetime of the father was that of Jeremiah, Jr.  His testimony was heard under objections reserved to his competency as a witness.  He was not competent to testify to payment of rent to the father during the lifetime of the father. The court found and recited in the decree the improvements made by the sons, and each of them, on the lands described in the deeds to them, respectively, did not exceed in value the amount of the rent of the respective tracts during the period of the lifetime of the father. The record contains the proof to support this finding. Each of the deeds recited a specified money consideration, but the proof warranted the conclusion that in fact no consideration was paid in any instance.

The decree that said deeds, and each of them, be set aside and vacated is affirmed.  The decree that the said writing purporting to be the last will of said Jeremiah Ring, Sr., deceased, is not his last will must be reversed, and the cause will be remanded for the determination of the issue as to the testamentary capacity of said Jeremiah Ring, Sr., to execute said will. A decree of partition in advance of the decision of that question is manifestly erroneous. The decree in partition is, therefore, reversed. The parties will pay the costs made by them, respectively, in this court.     *Reversed in part and remanded.*