VERNON ANUNDSON et al., Plaintiffs, v. THE CITY OF CHICAGO et al., Defendants.

RAYMOND P. KAEPPLINGER, Petitioner-Appellant, Cross-Appellee, v. WILLIAM HARMON, Respondent-Appellee, Cross-Appellant.

(Nos. 55634, 55840, 55940 cons.;

First District (3rd Division)—November 21, 1973.

*Rehearing denied December 28, 1973.*

Sidney A. Karasik, of Chicago, for appellant.

Richard M. Calkins, of Burditt and Calkins, of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Raymond P. Kaepplinger, appeals from an order of the circuit court of Cook County dissolving an injunction. The injunction, which was mandated by this court in its decision in *Anundson v. City of Chicago* (1968), 97 Ill.App.2d 212, 240 N.E.2d 407, enjoined further construction or use of certain property located in the City of Chicago until it was in conformance with the requirements of the applicable city ordinance. This court's decision was affirmed by the Illinois Supreme

Court. (*Anundson v. City of Chicago* (1970), 44 Ill.2d 491, 256 N.E.2d 1.) The trial court, in dissolving the injunction after remand and after hearings, found that as a result of construction changes the property was in compliance with the ordinance and city building code. Respondent, William Harmon, has filed a cross-appeal maintaining that the trial court abused its discretion in granting Kaepplinger attorney's fees totalling $12,760.

The litigation has been long and complex. The facts occurring prior to the remand of the cause are not in dispute. In 1962 a declaratory judgment was entered by Judge Dougherty finding the density requirement of the Chicago Zoning Ordinance null and void as they applied to the property located at 5655 West Fullerton Avenue, Chicago. The judgment further provided that the Anundsons, then the owners of the property, had the right to construct a three-story building containing eleven stores and offices, six single-bedroom apartments, and six efficiency or one-room apartments. The zoning ordinance provided that such a building would require parking facilities on the premises for seven cars.

The building subsequently was constructed. In addition to the stores, offices, and apartments permitted by the judgment order, the building contained an auditorium capable of holding 600 persons and a fourth floor roof garden capable of holding 250 persons. Eight of the rooms designated as offices contained bathtubs.

In 1966 Kaepplinger, owner of premises adjacent to the property in question, filed an intervening petition calling the court's attention to the violations of the declaratory judgment. He pointed out that the building under construction contained the auditorium and roof garden and that no parking facilities were planned on the premises. Kaepplinger also pointed out that the only notice given to adjoining landowners recited that plaintiffs were seeking to erect a three-story building containing eleven offices and only eight apartments. Kaepplinger asked the court to vacate the judgment and enjoin further construction. Although Judge Dougherty denied the intervening petition, he stated that the owners had violated the terms of the declaratory judgment. At a hearing prior to the entry of the declaratory judgment in 1962, the judge and an assistant corporation counsel for the city had warned the owners that they were jeopardizing the suit by amending the complaint without giving additional notice to the adjacent landowners. Despite the warnings, the judge entered judgment in favor of plaintiffs, and the city did not appeal.

After the denial of his intervening petition, Kaepplinger appealed. Only the intervening respondent, Harmon, filed an appearance and answering brief as appellee. Harmon, stating that he was the contractor on the premises, asked this court to dismiss the appeal on the grounds

that Kaepplinger had not served a notice of appeal on Reuben and Eve Sonshine, who had purchased the property from the Anundsons after the entry of the declaratory judgment. This court refused to dismiss the appeal and held that the notice to the adjoining landowners failed to describe accurately the proposed building, that the building did not correspond to the plans submitted to the trial court, and that neither the court nor the neighboring property owners were advised of the intention of the plaintiffs and their contractor to deviate from the purported plans. The court went on to state at p. 224:

> "The parties apparently believed that a completed building would save them from further legal regulation. It is our opinion that the integrity of the law and the orders of a court are at stake and are of prime importance."

This court remanded the cause with directions to enjoin the construction or use of the property in question until it conformed to the requirements of the applicable ordinance.

As has been noted, Harmon contended in this court in 1968 that Kaepplinger's appeal should be dismissed because his failure to give notice to the Sonshines, who Harmon alleged were the owners and real parties of interest in the property, constituted a denial of due process to the Sonshines. However, it was subsequently discovered by Kaepplinger's counsel that months before Harmon so argued to this court he had acquired the sole beneficial interest in the premises from the Sonshines.

On May 7, 1970, after this court's mandate was received, the trial court entered an order enjoining Harmon from using the basement facilities as a meeting hall; from using the roof garden for any purpose; from any further construction or use of the property commencing July 10, 1970; and from granting any further leases.

On June 9, 1970, Harmon filed a petition asking the trial court to permit him to eliminate the fourth floor deck and to remodel the basement into a garage, thereby providing eight inside parking places and eliminating the basement as a meeting place. Harmon also stated that he had received an approved permit for the work from the city, and he requested that the injunction scheduled to commence on July 10 be extended to September 30. At a hearing on Harmon's motion, Kaepplinger's counsel stated that while he had no objection to the proposed work, he was concerned with the manner in which the basement remodeling was being done, although conceding that it apparently was in conformance with the city code.

At that hearing Irving Addis, Harmon's architect, testified and identified Exhibit "B", a three-page copy of drawings for the work contem-

plated. Addis testified that these drawings were the plans approved by the building department and that they were in compliance with the building code and the ordinance. The plans indicated the construction of a ramp area from the alley elevation to the basement, and Addis testified that the incline of the ramp set out in Exhibit B was 15 degrees. Since the plans apparently had been approved by the city, the court granted Harmon's motion.

Kaepplinger subsequently sought a further hearing on the proposed changes in the basement, charging that the degree of incline of the ramp, according to Exhibit B, was 30 degrees rather than 15 degrees, and therefore unsafe. Kaepplinger sought to introduce expert testimony that the ramp, as constructed, was unsafe, but the trial court held that such testimony was inadmissible on the grounds that the only issue was whether the work was done in conformity with the city code.

On September 21, 1970, Kaepplinger filed a motion stating that Harmon had submitted one set of building plans to the city building department and another set of plans, Exhibit B, to the court for approval, and that the ramp as constructed was not in compliance with the mandate. Harmon answered that two sets of plans had indeed been submitted, but maintained that Exhibit B was in substantial conformance with the plans submitted to the building department. He also conceded that the ramp was constructed according to Exhibit B. The trial judge set the matter for hearing as to whether Harmon had committed a fraud on the court.

At the hearings relative to fraud, it was learned that the ramp as constructed had not been approved by the city, that the city considered it unsafe, and that it had issued a stop order on the work. Harmon's trial counsel testified that after the original plans, Exhibit B, had been submitted to the city, the building department requested certain revisions. Revised plans were submitted and approved by the building department, but somehow the original plans, Exhibit B, were attached to the court petition and given to Kaepplinger's counsel. The architect testified that Exhibit B showed a steeper incline than the revised set approved by the city. Addis further testified that during the construction of the ramp Harmon called him to say that the ramp could not be installed in the manner approved by the building department because of the presence of plumbing pipes. Addis told Harmon that it would be permissible to proceed according to Exhibit B without getting further approval from the city because nothing in the code prescribed the degree of slope for a ramp.

After hearing the testimony, the trial judge ruled that a fraud had been perpetrated on the court, commenting that it was typical of what

had occurred throughout the litigation, the "misleading of courts" and the "wilful, flagrant violation" of the original judgment. The trial court then appointed counsel for the mortgagee of the premises as receiver of the building with directions to handle and maintain the premises and to rebuild the ramp to bring it into conformity with the court orders. The receiver had the ramp rebuilt, and the city approved the construction. At the final hearing, the city inspector testified that the building conformed to the permits issued by the city. Kaepplinger's counsel again attempted to introduce evidence that the ramp would be dangerous, but the trial judge once more held that the only issue was whether the city code was violated. The trial court entered judgment finding that the alteration conformed to the building department requirements and that the building was now in compliance with this court's mandate.

Kaepplinger's sole contention on appeal is that the trial court erred in not hearing evidence as to whether the parking facilities provided in the basement of the premises could be safely used for the purpose intended.

■■ The trial court correctly held that the only issue before it was whether Harmon's plans complied with the building code of the City of Chicago. This court's mandate directed the trial court to enjoin further construction or use of the premises until it was in conformance with the requirements of the city ordinance. When a judgment is reversed and the cause is remanded with specific directions as to the action to be taken by the trial judge, the only issue properly presented is whether the order is in accord with the mandate and direction of the reviewing court. (*People v. National Builders Bank* (1957), 12 Ill.2d 473, 147 N.E.2d 42.) The trial judge properly followed the directives of our mandate. The production of expert testimony as to the adequacy of the city code would be irrelevant to this court's mandate. Chaos would be invited if, after a party obtained a permit and fully complied with the code, courts could consider expert testimony to determine whether the work had been done safely. In the present case, the trial court, with the effective assistance of Kaepplinger and his counsel, saw to it that Harmon fully complied with the code. The court did not err in dissolving the injunction.

■■ Harmon has filed a cross-appeal urging that the trial court abused its discretion in entering two orders granting Kaepplinger's counsel attorney's fees. On May 21, 1970, after this court's mandate was issued, Kaepplinger initially petitioned the court for such fees pursuant to statute. The statute (Ill. Rev. Stat. 1961, ch. 24, par. 11—13—15) provided in pertinent part as follows:

"In case any building or structure is constructed, reconstructed,

altered, repaired, converted, or maintained, or any building, structure, or land is used in violation of this Division 13, or of any ordinance or other regulation made under the authority conferred thereby, the proper local authorities of the municipality, or any owner or tenant of real property in the same contiguous zoning district as the building or structure in question, in addition to other remedies, may institute any appropriate action or proceeding (1) to prevent the unlawful construction, reconstruction, alteration, repair, conversion, maintenance, or use, (2) to prevent the occupancy of the building, structure, or land, (3) to prevent any illegal act, conduct, business, or use in or about the premises, or (4) to restrain, correct, or abate the violation. When any such action is instituted by an owner or tenant, notice of such action shall be served upon the municipality at the time suit is begun, by serving a copy of the complaint on the chief executive officer of the municipality, no such action may be maintained until such notice has been given.

\* \* \*

If a permanent injunction is decreed in any action or proceeding for a purpose mentioned in this section, the court in its decree may, in its discretion, allow the plaintiff a reasonable sum of money for the services of the plaintiff's attorney. This allowance shall be a part of the costs of the litigation assessed against the defendant, and may be recovered as such."

In 1969 the above statute was amended to provide that the awarding of fees to plaintiff's attorney was mandatory upon the court. The trial court, however, properly rejected Kaepplinger's argument that the 1969 amendment was applicable to the present case and correctly held that the awarding of fees was discretionary.

Harmon filed objections to the petition for fees. After conducting hearings, the trial court, on August 4, 1970, entered an order assessing attorney's fees against Harmon in favor of Kaepplinger in the sum of $11,220. Subsequently, at the suggestion of the trial court, Kaepplinger filed a petition for additional fees for discovering and disclosing the fraud perpetrated upon the court in connection with the switching of construction plans. On November 25, 1970, the trial court entered an order awarding Kaepplinger's attorney additional fees in the amount of $1600. In 1971 the trial court denied a motion to vacate the judgment for additional fees, but it reduced the amount to $1560.

Harmon maintains that for several reasons Kaepplinger did not establish his right to attorney's fees under ch. 24, par. 11—13—15 of the Illinois Statute.

■■ We initially shall consider defendant's argument that Kaepplinger failed to serve the chief executive officer of the municipality with notice as required by the statute. The City of Chicago has been a party to the proceedings since their initiation in 1961, and it was duly served by Kaepplinger with notice of his intervening petition in 1966. We deem this to be sufficient notice under the statute.

Harmon also urges that, since the injunction entered by the trial court was not permanent as required by the statute, Kaepplinger was not entitled to attorney's fees. The trial court permanently prohibited the use of the basement premises for an auditorium or for any purpose other than the parking of automobiles. The court further permanently prohibited the use of the fourth floor of the premises as a roof garden, or for any purpose other than a roof or a private office for Harmon. In these respects the injunction clearly was permanent.

■■ Harmon next argues that Kaepplinger's petition failed to comply with the statute governing fees in that it failed to seek the enforcement of an ordinance, but rather sought to enforce Judge Dougherty's original declaratory judgment. However, Kaepplinger's original petition did indeed maintain that the premises were in violation of the code. Moreover, this court, in its mandate, directed the trial court to enjoin use of the premises until they were brought into compliance with the applicable city ordinance. Both this court and the Supreme Court recognized that Kaepplinger, along with his other requests, sought the enforcement of the city ordinance.

Harmon further contends that Kaepplinger did not establish his right to fees because he was guilty of laches in waiting until 1970 to petition for fees, that he failed to request fees in his original petition, and that Kaepplinger violated Section 34 of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 34) which prohibits prejudice to an adverse party by means of surprise.

■■ Laches is defined as the neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration and other circumstances causing prejudice to an adverse party, as will operate as a bar to a suit. (*Ring v. Lawless* (1901), 190 Ill. 520, 60 N.E. 881.) Harmon maintains that Kaepplinger's failure to seek fees until 1970 constituted laches or such delay as to bar him from obtaining fees. We do not agree. In 1966 the trial court dismissed Kaepplinger's petition. Kaepplinger's standing to appeal had been challenged by Harmon in this court and in the Supreme Court. Until the issuance of this court's mandate in 1970, it is understandable that Kaepplinger would not seek fees or even consider the possibility of such a request. Moreover, Harmon has not demonstrated any prejudice accruing to him as a result of the

delay. Harmon suggests at one point in his brief that he may not have persisted in seeking leave to appeal from the Supreme Court if he were aware of the possibility of having to pay Kaepplinger's attorney's fees, but he then concedes that in any event he would have appealed to the highest court. The trial court correctly held that Kaepplinger was not guilty of laches or untoward delay in seeking fees.

In connection with the award of $1560 in additional attorney's fees, Harmon contends that the matter of the two building plans was an innocent, inadvertent mistake rather than a fraud perpetrated upon the court. This argument overlooks the fact that Harmon deliberately persisted in erecting a ramp according to plans which had been rejected by the City of Chicago. This final arrogant act on the part of Harmon typified his deliberate misrepresentations to all the courts throughout the history of this litigation.

Harmon finally contends that if an award of attorney's fees to Kaepplinger's counsel was warranted, the amounts awarded by the trial court were excessive.

Kaepplinger's counsel, making use of time cards, testified at both hearings on fees as to the amount of time he had spent on the present litigation. In connection with the initial award of $11,260, counsel testified that he had spent 328 hours on the matter commencing in October, 1966. The trial judge deleted all the time, amounting to 26 hours, spent before Judge Dougherty at the original hearings from October, 1966, through January 11, 1967. The court also deleted 24½ hours claimed by counsel which the judge believed might have been spent on certain companion litigation. The trial judge found that Kaepplinger's counsel had spent over 277 hours on the matter, stated that he was taking judicial notice that $40.00 per hour was a standard and proper allowance for an attorney's time, and entered an award of $11,260.

The second request for fees was made by Kaepplinger's counsel at the direction of the trial court. The award was given to counsel by the court for discovering and disclosing the fraud perpetrated by Harmon in connection with the two sets of building plans for the ramp. Kaepplinger's counsel testified that he had spent 39 hours in discovering the two sets of construction plans and in presenting that evidence to the court. As a result, the trial court awarded him an additional $1560 in fees.

■■ The trial court conducted thorough hearings on the matter of attorney's fees and was careful to confine Kaepplinger to the time he had spent on the present litigation. Counsel was compelled to spend many hours in combating Harmon's deliberate and calculated misconduct. In his successful efforts to prevent Harmon's illegal use of the premises, Kaepplinger's counsel well earned his fees under the statute. And in view

of the vast amount of work caused counsel by Harmon's misconduct, the awards were not excessive. We also hold that the trial court did not err in taking judicial notice that forty dollars per hour was a proper standard for attorney's fees. The trial court did not abuse its discretion in fixing the amounts of compensation.

For the reasons stated, the order of the circuit court of Cook County dissolving the injunction is affirmed. The orders awarding Kaepplinger attorney's fees in the amounts of $11,260 and $1560 are also affirmed.

Orders affirmed.

DEMPSEY, P. J., and McGLOON, J., concur.