PERRY J. ENGLAND *et al.*

*v.*

MATTIE S. FAWBUSH.

*Opinion filed October 26, 1903.*

1. WILLS—*effect of fact that will is written by a beneficiary.* That a will is written or procured to be written by a person largely benefited thereby is a circumstance exciting greater scrutiny and requiring stricter proof of volition and capacity than in other cases.

2. SAME—*effect of active agency of beneficiary in procuring will.* The active agency of the chief beneficiary in procuring a will, especially in the absence of those having an equal claim to bounty of the testator, who was enfeebled by age and disease, is a circumstance indicating the probable exercise of undue influence.

3. SAME—*what sufficient to go to jury on question of undue influence.* Evidence that the chief beneficiary in a will had made arrangements in advance for having it drawn, sent for the justice of the peace and the witnesses, talked with the testator in his sick room about the will, wrote it himself and read it to the testator, corrected the testator as to the amount of a certain legacy and held the testator up in bed while he signed the will, is sufficient to go to the jury upon the issue of undue influence.

4. SAME—*effect of inequality in division of property.* Inequality in the division of property by a will, while not of itself conclusive evidence of undue influence, is a circumstance which may be considered, with others, by the jury in determining that question.

5. SAME—*the rule as to testamentary capacity.* To possess sufficient testamentary capacity to make a will the testator must, at the time of making the instrument, have sufficient mind and memory to understand the particular business in which he is engaged.

6. INSTRUCTIONS—*when instructions do not single out particular circumstances.* An instruction which refers to one circumstance as indicating undue influence is not erroneous, as giving such particular circumstance undue prominence, where other circumstances bearing upon the same question are set forth in other instructions, since all of the instructions must be read together as one charge.

7. SAME—*when party cannot complain of instruction.* A party can not complain of an instruction given for his opponent if his own instruction is open to the same objection.

8. SAME—*repetitions of instructions need not be given.* It is not error to refuse an instruction if its substance is embodied in instructions already given for the same party.

9. EVIDENCE—*admissibility of declarations of testator.* Declarations of the testator, while not admissible to modify the will or show that

it was executed under duress or undue influence, may be proven, as tending to show the mental condition of the testator.

10. SAME—*what may be shown as bearing upon undue influence.* As bearing upon the subject of undue influence it is not error to permit proof of previous conduct of the party claimed to have exercised such undue influence, as tending to show his influence over the testator.

WRIT OF ERROR to the Circuit Court of Menard county; the Hon. THOMAS MEHAN, Judge, presiding.

This is a bill, filed in the circuit court of Menard county on the 18th day of June, 1902, by the defendant in error, Mattie S. Fawbush, against the plaintiffs in error, Perry Joseph England, Maranda Miller, Mary Sheneman and Perry Joseph England, executor of the last will of Jesse England, deceased, for the purpose of setting aside the last will and testament of said Jesse England. The bill alleged that the testator was of unsound mind and memory when the will was made, and was under the improper restraint and undue influence of his son, Perry Joseph England, one of the plaintiffs in error, and seeks to set aside the probate of the will upon the two grounds, thus alleged, of unsoundness of mind and memory, and the exercise of undue influence. The bill further alleges that Jesse England, in his lifetime and on January 9, 1902, executed a paper, purporting to be his will, and on January 12, 1902, died testate, leaving defendant in error, Mattie S. Fawbush, his grand-daughter, and his daughters, Mary Sheneman, Maranda Miller and his son, Perry Joseph England, plaintiffs in error, and his son, Paren England, since deceased, his only heirs-at-law; that the will was on February 21, 1902, probated by the county court of Menard county, and letters testamentary were granted to Perry Joseph England as executor; that the deceased owned, at the time of his death, real estate of the value of about $50,000.00; that he was at the time of executing his will eighty-seven years old and suffering from a mortal illness. The bill was answered by Maranda

Miller, Mary Sheneman, Perry Joseph England and Perry Joseph England, executor, admitting all the allegations of the bill, except those to the effect that the testator was not of sound mind and memory, and had been induced to make his will by undue influence, the latter allegations being denied.

The case was tried before the court and a jury; and the jury returned a verdict, finding that the writing read in evidence, purporting to be the last will and testament of Jesse England, deceased, was not the last will and testament of the said Jesse England. Motions to set aside the verdict and for a new trial were overruled, to which the defendants below took an exception. Thereupon, on November 1, 1902, a decree was entered setting the will aside, to which decree defendants below took exception.

Jesse England, the testator, at the time of his death, was a farmer, residing on his farm of about three hundred and thirty-nine acres, valued at $32,950.00. His death on January 12, 1902, took place after an illness of only six days, his disease being pneumonia of a threatening character. His wife had died in 1894, and his daughter, Mrs. Mott, mother of defendant in error, died in 1896 at his home. His son, Paren England, died intestate on June 9, 1902, in Kansas City, Missouri, leaving his brother, Perry Joseph England, his two sisters, Maranda Miller and Mary Sheneman, and his niece, Mattie S. Fawbush, his only heirs-at-law.

By the terms of his will as probated, the testator gave to his grand-daughter, the defendant in error, Mattie S. Fawbush, $500.00; to his daughter, Maranda Miller, one large flower wreath; to his son, Perry Joseph England, $1500.00; the residue of his estate he gave and bequeathed to his daughters, Mary Sheneman, Maranda Miller, and his sons, Paren England and Perry Joseph England, share and share alike. The will provided that, in case his son, Paren England, did not claim his share within five years, his portion of the estate should be divided equally be-

tween the two daughters, and the son, Perry Joseph. Perry Joseph England was made executor without bond. There were four witnesses to the will, which was dated January 9, 1902, three days before the testator's death, but only three of these witnesses testified before the county court when the will was admitted to probate, and only three of them have testified in this case. Their names were Joseph Myers, Henry Oleson, James S. King and James L. Rayburn. Oleson is the witness, who has not testified.

T. W. McNEELY, F. E. BLANE, and N. W. BRANSON, for plaintiffs in error.

JOHN M. SMOOT, and CHARLES NUSBAUM, for defendant in error.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The bill in this case seeks to set aside the will of the testator upon the ground that at the time of its execution he was not of sound mind and memory, and also upon the ground that his son, Perry Joseph England, exercised an undue influence over him, so that the execution of the will was not his own act.

A large amount of testimony was taken upon the question, whether or not the testator was of sound mind and memory when he made his will. Nearly all this testimony has reference to the condition or state of the testator's mind, as shown by his actions and expressions prior to his last illness. The evidence tends to show that, before the beginning of the final sickness which resulted in his death, the testator was a man of sound mind and memory. One of the contentions of the plaintiffs in error is, that there was not sufficient evidence, sustaining the charge that he was not of sound mind and memory, to warrant a submission of the case to the jury upon that question. We do not deem it necessary to pass

any opinion upon this question, although there is some evidence, tending to show that during his last sickness when his will was made his mind and memory were not as sound as they had been theretofore.

The other charge in the bill, upon which it was sought to set aside the will, was the charge of undue influence, exercised over the testator by his son, the plaintiff in error, Perry Joseph England. The charge in the bill is, "that said deceased in executing same [his will] was under improper restraint and undue influence from said arts and fraudulent practices of said Perry Joseph England." There was sufficient evidence upon this branch of the case to submit to the jury the question, whether the paper introduced in evidence, as the will of the deceased, was in fact his will. The verdict of the jury is general in terms, and does not specify whether in the opinion of the jury the testator was of unsound mind and memory, or whether he was the victim of undue influence.

The plaintiff in error, Perry Joseph England, lived on his own farm near the home of his father. At the time of his death the testator was a widower and lived alone on his own place. His daughter, Mrs. Mott, the mother of the defendant in error, who had kept house for him, had died in 1896, and after that date he seems to have been surrounded by hired servants, and not by any of his family.

On the morning of January 9, 1902, three days before the testator's death and while he was very sick, his son, Perry, was with him, and the subject of making his will was talked of between them. A man, named Rayburn, who had been justice of the peace for many years in Menard county, lived north-east of the testator on an adjoining farm. On January 9, Perry England sent his son after Rayburn to come to the testator's house to draw his will. He invited Rayburn into the house, gave him a seat in an adjoining room, and went alone into the sick room, and talked with the testator for some time.

Perry's daughter was there. In a few minutes Perry called Rayburn into the bed-room where his father was lying in bed. While Rayburn was sitting in the sitting-. room, he could hear Perry's voice talking to his father, but could not hear what he said. When Perry called Rayburn into the sick room, he informed his father that Rayburn had come to fix his will. The testator then made some remark about his son, Paren, saying that he did not know where he was, and had not heard from him for two years, and said that, if Paren should come back within five years, he was to have his share of the estate, and if not, it was to be divided among the others. The. testator then told Rayburn that he wanted his daughter, Maranda, to have a certain picture; that he wanted to give Perry $1500.00, and to give his grand-daughter, Mattie Fawbush, $5000.00, but Perry corrected him so as to make the amount $500.00. Upon this subject Rayburn says: "He wanted to give Perry $1500.00, and to give Mattie Fawbush, he said, $5000.00, and Perry said to me or him, I don't know who he meant to say it to, 'He means five hundred;' and the old man laid there a little bit, and then he says, 'Yes, five hundred;' and then he wanted the balance of his property divided equally between the heirs. I think he named them."

Rayburn says that they then went out into the other room to draw the will. He there found lying on a stand the blank form of a will. He said to Perry: "What is this doing here?" And Perry said, "I had it here in case of an emergency. I have had it two years." Rayburn states that he had forgotten his glasses, and did not have them with him, and asked Perry if he could not write the will. Perry said: "I will write it if you will tell me what to put in it." Rayburn said, "All right." Perry offered to send his son, Jesse, after the glasses, but Rayburn said it was a short will, and it could be written before his son would get back with the glasses. Rayburn then states that he dictated the will, and Perry wrote it

down. At first he wrote the will with a pencil. Rayburn says that he dictated the will as the testator had directed him to make it, and Perry wrote it down in pencil. At this point Rayburn says: "He wanted to give Perry $1500.00, and he wanted Maranda to have that picture, and Martha Fawbush to have $500.00, $5000.00 he said, and Perry kinder corrected him, and he said then $500.00, and then the balance of his property he wanted divided equally between his children." Rayburn further states that, after the will had been thus drafted in pencil, they went in, and Perry read it to his father, whereupon Rayburn asked the testator if it was correct, and the testator answered "Yes." They then went back into the sitting-room, and got another sheet of paper, and Perry wrote the will with pen and ink. Perry read over the will to Rayburn as he had written it in ink, and they then went back into the sick room, and Perry read the will again to his father. The will was not read to the testator clause by clause, but as a whole, from beginning to end without stopping. It was read to his father by Perry, and the latter was as close as he could get to the testator.

The witnesses were in the yard, and at least two of them had been sent for by the plaintiff in error, Perry Joseph England. Perry went out and brought the witnesses in. He said nothing to them about signing the will as witnesses, and Joseph Myers said, "Uncle Jesse, that is your last will, is it, and you want us to sign as witnesses?" and he said, "Yes;" then they all signed it. Rayburn says that the testator did not request them to sign the will, but, when Myers asked him if he wanted them to sign it, he said "Yes." When Rayburn left the room after the testator had talked to Rayburn in Perry's presence about his will, Perry said: "Don't let anybody go in there while we are away."

Upon cross-examination, Rayburn says that he did not know whether the testator "was or not of sound mind

and memory at the time he executed that will. The only thing he said was 'Yes' in answer to what Joe Myers said to him; he was very sick; I noticed, when he was talking, he would stop and kinder catch his breath like he was short of breath; he was very hard of hearing." He says also he does not know whether the testator heard what was read or not, but says, "After he read it, I asked him if that was all right, and he said 'Yes;' that was all the answer he made." Rayburn further says on cross-examination, "Perry was to get $1500.00.—Q. Then about Martha Fawbush?—A. Well, when he came over that he said five thousand, and Perry said 'He means five hundred.' The old gentleman laid there a little bit, then he said, 'Yes, five hundred.'" Rayburn also says that, when they were preparing the pencil draft, Perry said something about a note that his father held against him for $1500.00. The extra amount, given him by the will, would appear to have been the exact amount of the note held against him by his father. When Perry called the witnesses into the bed-room, Rayburn told the testator that he (the testator) must request the witnesses to sign, and that it would not do for any one else to do so; and that the testator then said: "What is it their business about my will?" When the will was signed, the testator was propped up in bed, Perry supporting him, and sitting behind him while he signed it. One of the witnesses suggested that, in view of the illegible signature of the testator, his hand should be held and the will should be re-signed, but Perry refused to comply with this suggestion. When the witnesses came in, there was quite a pause, and they waited for the testator to request them to sign. Perry then said to his father: "Tell these men what you want them to do," but he said nothing, until Myers asked him if that was his will and if he wanted them to sign it as witnesses; and he then answered "Yes." The word "yes," thus uttered, was the only word spoken by him in the presence of the witnesses.

He was at the time suffering pain from pneumonia and pleurisy. The doctors say that he was afflicted with Bright's disease, kidney, lung and heart trouble.

It thus appears that Perry Joseph England, one of the plaintiffs in error and one of the chief beneficiaries in the will, made preparations beforehand for the drawing of the will, sent for the scrivener to draw the will, sent for one or more of the witnesses to witness the will, talked with the testator about the will before the scrivener was called into the sick room, went into the sick room with the scrivener, wrote the will with his own hand, both the pencil copy and the ink copy, read the will to his father, held his father up in bed while he signed the will, gave instructions that no one be admitted to the sick room while he was writing the will, and corrected his father, when the latter directed the scrivener to write in the will a legacy of $5000.00 to defendant in error, by telling the scrivener, or by remarking in the presence of the scrivener, that his father had made a mistake, and that the correct amount was $500.00, instead of $5000.00.

In addition to all this, Rayburn says upon his cross-examination: "When he [Perry] commenced to copy it [the will] in ink, somebody said dinner was ready; he told me to go on to dinner, that he had the form there now, that he could write it, as well without me as with me, and I went on to dinner. When I got back, he was still writing, nearly done. Then he took it, and read it to the old gentleman, in about the same tone of voice. The old gentleman was still in bed. I don't know whether he heard it or not; he read right along just as he did at first."

Where a will is written, or procured to be written, by a person largely benefited by it, such circumstance excites stricter scrutiny and requires stricter proof of volition and capacity. The proof, required in such cases, must be such as to fully satisfy the court or jury that the

testator was not imposed upon, but knew what he was doing, and what disposition he was making of his property when he made his will.   The active agency of the beneficiary of a will in procuring it to be drawn, especially in the absence of those who have at least equal claims upon the justice of the testator, and where the testator is enfeebled by old age and disease, is a circumstance which indicates the probable exercise of undue influence.   Where the mind is wearied and debilitated by long continued and serious and painful sickness, it is susceptible to undue influence and is liable to be imposed upon by fraud and misrepresentation.   "The feebler the mind of the testator, no matter from what cause,— whether from sickness or otherwise,—the less evidence will be required to invalidate the will of such person." (*Purdy* v. *Hall*, 134 Ill. 298; *Smith* v. *Henline*, 174 id. 184; *Keyes* v. *Kimmel*, 186 id. 109).

In view of the testimony, which has been quoted and referred to, it cannot be said that there was no evidence before the jury, authorizing them to pass upon the question whether or not the will was the result of an exercise of undue influence over the testator by his son, Perry Joseph England.

The court gave to the jury the following instruction:

"The court instructs the jury that, if you believe from the evidence, that Jesse England was by any fraud, compulsion or improper conduct on the part of Perry J. England, induced or unduly influenced to make the paper alleged to be his will, then you should find that the paper in question is not his will."

The jury having found under this instruction, and others, which were given to them, that the paper in question was not the last will and testament of Jesse England, we are not disposed to disturb the decree of the court below setting aside the will, based upon their verdict, unless it appears that the trial court committed some error of law, which requires a reversal.   It remains,

therefore, to consider the alleged errors complained of by the plaintiffs in error.

The plaintiffs in error contend that the court erred in giving the first instruction, which it gave for defendant in error, the contestant. That instruction is as follows:

"The court instructs the jury that inequality in the distribution of property among those who would inherit if no will had been made, is not of itself evidence of undue influence or unsoundness of mind, yet it may be considered as a circumstance by the jury, together with all the other facts and circumstances shown by the evidence, as tending to establish undue influence or unsoundness of mind."

We are unable to see any error in the giving of this instruction in view of the decisions heretofore made by this court upon this subject. We have held that, while inequality in the distribution of property is not of itself conclusive evidence of undue influence, yet it may be considered as a circumstance, tending to establish undue influence, in connection with all the other facts and circumstances in the case. (*Webster* v. *Yorty*, 194 Ill. 408; *Hollenbeck* v. *Cook*, 180 id. 65; *Kaenders* v. *Montague*, 180 id. 300; *Taylor* v. *Pegram*, 151 id. 106; *Pooler* v. *Cristman*, 145 id. 405).

The second instruction, given for defendant in error, is also complained of. That instruction tells the jury "that, if you believe from the evidence the said Jesse England, at the time he executed the will now in question, was feeble in body and mind from sickness, old age or otherwise, and that while in this condition his son, Perry Joseph England, unduly influenced him to make said purported will, and that at said time the said Jesse England was not a free agent, but was under the undue influence of said Perry Joseph England, then you should so find by your verdict." The views, expressed in this instruction, have been endorsed by this court in a number of cases. We have said that advanced age and loss of memory do not necessarily of themselves indicate a

want of capacity to dispose of property, but that a testator is more liable to be unduly influenced when his mind has become impaired by serious sickness, and that undue influence, which will justify the setting aside of a will, must be such as to deprive a testator of his free agency. (*Pooler* v. *Cristman, supra; Taylor* v. *Pegram, supra; Purdy* v. *Hall*, 134 Ill. 298; *Francis* v. *Wilkinson*, 147 id. 370). In *Francis* v. *Wilkinson, supra*, we said (p. 381): "Undue influence, which will justify the setting aside of an executed deed, must have been of such a nature as to deprive the grantor of his free agency, and thus to render his act more the offspring of the will of another than of his own will."

It is said, however, in regard to the first and second instructions, given for the defendant in error by the trial court, that these instructions single out certain circumstances, and make them the subjects of instructions, as tending to prove undue influence. In support of this contention the case of *Rutherford* v. *Morris*, 77 Ill. 397, is referred to. But in *Pooler* v. *Cristman, supra*, the case of *Rutherford* v. *Morris*, if not actually overruled, was weakened by the remarks made by this court in reference thereto. In *Pooler* v. *Cristman, supra*, it was said: "But what is said in *Rutherford* v. *Morris* was not concurred in by a majority of the court, and cannot be regarded as authority." In addition to this, the defect, charged against the instructions, of singling out particular circumstances as tending to prove undue influence, can have no force when all the instructions are read together. It has often been said by this court that all the instructions must be regarded as one charge; and, where one instruction mentions one circumstance, and another another circumstance, so that all the material circumstances are thus brought before the jury, there is no singling out of any particular circumstance, so as to give it an undue prominence. In the case at bar, while one instruction may refer to inequality in the distribution of property,

and another to feebleness in mind and body from old age, and another to some other circumstance, yet all the material facts and circumstances, disclosed by the evidence, were by the instructions, viewed as one charge, correctly presented to the minds of the jury.

What has been said in regard to the first and second instructions, given for the defendant in error, disposes of the criticisms made by counsel for the plaintiffs in error upon the fifth instruction, given by the trial court for the defendant in error.

Complaint is made of the tenth instruction, given by the trial court for the defendant in error. That instruction is as follows:

"The court instructs the jury that, when undue influence is alleged, the real inquiry is this: Did the testator make and execute the alleged will, in all its provisions, of his own free will and volition, so that it now expresses his own wishes and intentions; or was the testator constrained or induced, through the undue influence, restraint, coercion or improper conduct of others, to act contrary to his own desires and intentions as regards the disposition of his property or any part of it?"

We think the language of this instruction is substantially endorsed by the following cases: *Francis* v. *Wilkinson, supra; Taylor* v. *Pegram, supra; Yoe* v. *McCord,* 74 Ill. 33. Counsel for plaintiffs in error seem to object to the words "improper conduct of others," as used in the instruction, upon the ground that the word, "others," would seem to refer to improper conduct, not only on the part of the plaintiff in error, Perry Joseph England, but of some other person. The objection is hypercritical, but the evidence does show that the scrivener, Rayburn, readily yielded to the suggestion of plaintiff in error, Perry Joseph England, when the latter corrected the directions of his father by substituting $500.00 in the place of $5000.00 in the drawing of the will. Rayburn also permitted Perry England to write the will, when a slight

delay would have placed it in his own power to draw the will as he was requested to do by the testator. Although he states that, after the copy in ink was drawn, he and Perry compared together the pencil copy and the copy in ink, yet it is to be remembered that he was still without his glasses, and their absence was the excuse for permitting the main beneficiary in the will to draw the will himself. There is also a portion of the testimony of Rayburn, which tends to show that, after making specific bequests to certain of the heirs, the testator intended the residue of his property to be divided between all the "heirs." If the word, "heirs," had been used in the will, the defendant in error would have been included within the terms of the will, because, her mother having died, she, by representation, would, as heir, have taken the same interest, which would have gone to her mother, if her mother had been living. It is not altogether clear from the testimony of Rayburn, whether the original directions of the testator required the residue to be divided among all his heirs, or among all his children, but the testimony, taken as a whole, is as much in favor of an intention to give the residue to the heirs, as to limit it to the children of the testator. Moreover, it does not appear that, in the directions given to the scrivener by the testator, the words, "said amount to be her entire share in my estate," were used. Those words, however, appear in connection with the bequest of $500.00 to the defendant in error, showing a determination to limit the bequest to the defendant in error to $500.00, when the language, originally used by the testator, would tend to show that it was his intention to give his grand-daughter $5000.00, instead of $500.00.

Complaint is also made of the eleventh instruction given by the trial court in behalf of the defendant in error. That instruction is as follows:

"The court further instructs you that if you believe from a preponderance of the evidence in this case, that

Jesse England, at the time of the execution of the pur-
ported will, was so diseased mentally that he was inca-
pable, by reason of mental weakness, caused by disease,
old age, or other derangement, of acting rationally in the
ordinary affairs of life, and of intelligently comprehend-
ing the disposition he was making of his property, and
the nature and effect of the provisions of said alleged
will, then they should find that the writing produced is
not the will of Jesse England, deceased."

This court has said: "It cannot be said, as a matter
of law, that because incapable of transacting ordinary
business a person is incapable of making a testamentary
disposition of his estate." (*Taylor* v. *Cox*, 153 Ill. 220;
*Craig* v. *Southard*, 148 id. 37; *Sinnet* v. *Bowman*, 151 id. 146).
The holding of this court in such cases is, that the real
question to be submitted to the jury is, "not whether
the party had sufficient mental capacity to comprehend
and transact ordinary business, but did he, at the time
of making the instrument purporting to be his will, have
such mind and memory as enabled him to understand
the particular business, in which he was then engaged?"
(*Ring* v. *Lawless*, 190 Ill. 520). In *Taylor* v. *Cox, supra,* we
held that an instruction, which told the jury that, to es-
tablish testamentary capacity, it was necessary to show
both sufficient mental capacity to knowingly and un-
derstandingly transact the ordinary business of life, and
also to comprehend the act of disposing of the testatrix's
property, was erroneous. It is not altogether clear that
the words, used in instruction numbered 11 here under
consideration, to-wit, "acting rationally in the ordinary
affairs of life," have the same meaning as the words, "to
knowingly and understandingly transact the ordinary
business of life." But, if the two expressions do have
the same meaning, instruction numbered 11 does not
say that, in order to establish testamentary capacity, it
is necessary to show both sufficient mental capacity to
knowingly and understandingly transact the ordinary

business of life, and also to comprehend the act of disposing of the testator's property.  Instruction numbered 11 merely requires the jury to believe that not only, at the time of the execution of the will of Jesse England, he was incapable, by reason of mental weakness, etc., of acting rationally in the ordinary affairs of life, but, in addition to this, that, at that time, he was incapable of intelligently comprehending the disposition he was then making of his property, and further that, at that time, he was incapable of understanding the nature and effect of the provisions of said alleged will.  If the testator was incapable of intelligently comprehending the disposition he was then making of his property, he was certainly incapable of transacting the ordinary business of life, and, in this respect, the instruction was not erroneous, because, in order to give the testator credit for testamentary capacity, it was only necessary for the jury to find that he was capable of intelligently comprehending the disposition he was then making of his property, whether he was capable of transacting the ordinary business of life, or not.  The doctrine of this court is that the testator has testamentary capacity, if, at the time of making the instrument purporting to be his will, he has such mind and memory as enables him to understand the particular business in which he is then engaged. This instruction, though awkwardly drawn, does not lay down the contrary of this proposition.  But if it should be regarded as erroneous in this respect, other instructions were given which laid down the correct rule as to testamentary capacity.  Some of the instructions so given were asked by and given for the plaintiffs in error themselves.  For instance, in instruction 5 given for the plaintiffs in error, the jury were told "that to be of sound mind and memory so as to be capable of making a valid will, it is sufficient if the testator has an understanding of the nature of the business in which he is then engaged, * * * If his mind and memory are sufficiently sound

to enable him to know and understand the extent and amount of his property, and his just relations to the natural objects of his bounty, and the business in which he is engaged at the time of executing his will, then he is of sound mind and memory within the meaning of the law."

But it is well settled that a party cannot complain of an instruction, asked by and given for his adversary, if he has asked for and obtained an instruction of the same character. The third instruction, given for plaintiffs in error at their request, began as follows: "The court instructs the jury that, in order to make a valid will, it is only necessary that a man shall have mental capacity sufficient for the transaction of the ordinary affairs of life, and possessing this, even though he may be feeble in mind and body from sickness or old age, he has the legal right to dispose of his property just as he pleases," etc. In view of what is said, we are unable to say that injury was done the plaintiffs in error by the giving of instruction numbered 11 complained of by them.

It is further charged that the trial court erred in refusing to give the fourteenth and fifteenth instructions asked by the plaintiffs in error. The fourteenth instruction so refused is as follows:

"The court instructs the jury that if they find from the evidence that the deceased in making the will in question was influenced by affection or attachment, or a disposition to gratify the wishes of defendant, Perry Joseph England, or by his advice and entreaty, that would not be sufficient ground for setting aside the will."

The fifteenth instruction so refused is as follows:

"The court instructs the jury that advanced age and impairment of memory do not necessarily and of themselves show a want of capacity to make a valid will and dispose of property."

There was no error in refusing the fourteenth and fifteenth instructions for the reason that their substance is embodied in instructions 10 and 11, and 3 and 6 given

for the plaintiffs in error.   The four latter instructions embodied fully all the ideas expressed in the fourteenth and fifteenth refused instructions.

It is said that the trial court erred in admitting improper evidence.   The court permitted some evidence to be introduced, showing the relations which existed between the testator and his deceased daughter, Mrs. Mott, to the effect that she had kept house for him, and that his feelings towards her were kindly and affectionate. Some evidence was also admitted, tending to show attempts on the part of Perry Joseph England to influence his father to refuse pecuniary aid to one of his sisters, when such aid was asked for.   We recognize fully the doctrine, frequently announced by this court and insisted upon by counsel for plaintiffs in error, that statements made by the testator, either before or after the execution of a contested will, which are in conflict with the provisions thereof, do not invalidate or modify such will in any manner, and that parties, making wills, cannot invalidate them by their own parol declarations made previously or subsequently.   (*Dickie* v. *Carter*, 42 Ill. 376; *Taylor* v. *Pegram, supra; Kaenders* v. *Montague, supra; Harp* v. *Parr*, 168 id. 459).   We do not regard the testimony complained of as in any way contravening this rule.   It was not testimony of the character condemned by the rule. In *Wilbur* v. *Wilbur*, 138 Ill. 446, we said (p. 450): "While it is true that the undue influence which will invalidate a will must be present and exercised over the mind of the testator at the time the will is made, yet it is competent to prove previous conduct of the one charged with procuring it to be made, as tending to show his influence over the testator at such time."   It is also a well settled rule that, while the declarations of the testator are not admissible to show an express revocation of his will, or the fact that it was executed under duress or undue influence, they may nevertheless be proved and used to show his mental condition at the time of the execution

204—26

of the will, or so near the time that the same state of affairs must have existed. (*Reynolds* v. *Adams,* 90 Ill. 134).

We are of the opinion that there was sufficient evidence, introduced before the jury, to justify them in finding that this will was produced by improper conduct and undue influence on the part of the plaintiff in error, Perry Joseph England. We are also of the opinion that plaintiffs in error have not pointed out any errors, committed by the trial court, of sufficient importance to justify us in reversing the decree of the circuit court, based upon the verdict so rendered by the jury.

Accordingly, the decree of the circuit court is affirmed.

*Decree affirmed.*