(No. 14892.—Reversed and remanded.)
ICY CENORA GREGORY, Appellee, *vs.* PAUL RICHEY *et al.*
Appellants.

*Opinion filed February 21, 1923—Rehearing denied April 5, 1923.*

1. WILLS—*when undue influence will invalidate a will.* Undue influence will invalidate a will where it is directly connected with the execution of the instrument, is operative when the will is made, is directed toward procuring the will in favor of certain parties, and is such as to destroy the freedom of the testator's will and purpose, thereby making the instrument more the result of the will of another or others than that of the testator.

2. SAME—*a confidential relation does not necessarily raise presumption of undue influence.* A confidential relation existing between a testator and a beneficiary does not necessarily raise or create a presumption of undue influence, but to create the presumption the relation must be used for the purpose of procuring the making of the will.

3. SAME—*evidence of testator's source of title is not competent in will contest.* In a will contest case, evidence to prove that the testator had acquired his property by means of money which his wife had inherited is not admissible on the issue of testamentary capacity.

4. SAME—*when evidence of services complainant rendered testator is not competent in will contest.* In a will contest, evidence that the complainant, who is the daughter of the testator, did all kinds of work on the farm prior to her leaving her father's home about the time of his second marriage is not competent on the issue of testamentary capacity, where the only purpose of such evidence is to show that the daughter helped to build up the place and what her father thought of her.

5. SAME—*when declarations of the testator are not competent.* Declarations or statements of a testator or a grantor are not admissible for the purpose of invalidating either a will or deed unless such declarations tend to show the mental condition of the maker of the instrument.

6. SAME—*when motion for additional security for costs comes too late.* Where the complainant in a will contest is a non-resident, a motion to require additional security for costs because of the death of a surety comes too late when not made until the day of the trial of the cause.

7. SAME—*court should not restrict cross-examination of witnesses giving opinions as to testator's mental condition.* Proponents

in a will contest should be allowed to cross-examine witnesses who express opinions as to the testator's mental condition by asking such witnesses what the testator said or did or what they observed in his conduct which indicated his unsoundness of mind.

8. SAME—*counsel should not repeat questions to which objections have been sustained.* The conduct of every court, the officers thereof and the attorneys should be such that the litigants may have, as nearly as possible, a fair and just trial, and in the examination of witnesses counsel should not repeat substantially the same questions to which objections have been sustained.

9. SAME—*what mental capacity is sufficient to make a will—instructions.* A testator may make a valid will if he has sufficient mind to understand he is making a will, to comprehend what property he has to dispose of, to know who are the natural objects of his bounty and make a disposition according to some plan formed in his mind, and it is error merely to instruct the jury, in a contest case, that if they believe from the evidence that the testator was not of sound mind and memory they should find against the will.

10. SAME—*testator is not required to know the legal effect of his will.* The requirement that a testator must comprehend the effect or consequence of his will does not mean that he must know the legal effect or construction to be given to it, but means that he must understand how he has disposed of his property.

11. SAME—*when jury should be accurately instructed on issue of mental incapacity.* Where a will which unequally divides the testator's property is contested on the ground of mental incapacity of the testator and the evidence given by credible witnesses on both sides is sharply conflicting, it is necessary that the jury be accurately instructed as to the law.

APPEAL from the Circuit Court of LaSalle county; the Hon. EDGAR ELDREDGE, Judge, presiding.

KELLY & KELLY, and ELMER E. ROBERTS, for appellants.

L. O. BROWNE, and BUTTERS & CLARK, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This case comes to this court on appeal from a decree of the circuit court of LaSalle county setting aside the last will of Jeremiah Studebaker, deceased; also a deed made

by him at the same time the will was executed, to Paul
Richey, who is one of the beneficiaries under the will.

The bill was filed in the LaSalle county circuit court by
Icy Cenora Gregory, a daughter of the testator, on Febru-
ary 6, 1918, alleging undue influence upon the deceased
and unsoundness of mind.  After some delay issues of fact
were made up (1) whether or not the writing purporting
to be the will of Jeremiah Studebaker was his will; and
(2) was the instrument conveying a certain 100 acres of
land to Paul Richey the deed of the deceased grantor, Jere-
miah Studebaker.  The case was tried by a jury in the cir-
cuit court during January, 1922.  On motion of defendants,
who are appellants here, the issue of fraud and undue in-
fluence was by the court withdrawn from the consideration
of the jury.  A verdict was returned finding the writing
was not the last will of deceased and the deed was not his
deed.  Motions to sustain the deed notwithstanding the ver-
dict of the jury, to set aside the verdict as to the will, and
for a new trial, were denied by the court.  Motion in ar-
rest of judgment was made and overruled and a decree en-
tered setting aside the will and deed.  An appeal was prayed
by Paul Richey, the grantee in the deed and one of the ben-
eficiaries under the will, and by James Warrick, executor.
Appellants have assigned errors jointly and severally, and
a cross-error has been assigned by the complainant below,
who is appellee here, on the ruling of the court taking the
issue of undue influence from the jury.

Some facts developed upon the trial were as follows:
Jeremiah Studebaker lived for many years on a farm in
LaSalle county, where he died December 19, 1916, at the
age of eighty years.  At his death he was the owner of
240 acres of land in LaSalle county and his personal prop-
erty was valued at about $25,000.  He was married twice.
His first wife died about 1887 and his second wife also
pre-deceased him.  There were no children by the second
marriage.  Three daughters were born to the first marriage,

two of whom died prior to their father. Deceased left surviving him one daughter, Mrs. Icy Cenora Gregory, appellee, who has no children and is now about fifty-seven years of age; a grandson, Paul Richey, one of appellants here and who is a son of one of the deceased daughters; also two grandchildren, Juanita and Wilson Mers, children of the other deceased daughter. All three of the grandchildren are of age. About the time of the second marriage of deceased, in 1893, the daughter Icy left her father's house and went to live with a sister. She was married in 1896, and about a year afterwards she and her husband occupied one of the houses (there being two sets of buildings) on her father's land and rented the farm for about six years. They later moved to Iowa, where they bought a farm and lived for some six years. They then moved to Colorado for two years, and from that State to Arkansas, where she resided at the time of the last illness and death of her father. After the death of deceased's second wife, in September, 1913, his grand-daughter, Juanita, lived with him awhile, and in April, 1914, his brother and wife moved into the house on the farm with him. His brother died there December 6, 1915. The farm, or part of it at least, was rented most all of the time. During September, 1915, Studebaker, who had formerly done his chores and work about the farm, drove over to Hampson's farm, some five or six miles away, where his grandson Paul Richey had been working for about a year, and arranged for Richey to come and live with him and do the work about the place. Richey took up his residence with Studebaker during the fall of 1915. Richey was married in June, 1916, and he and his wife lived on the place and assisted Mary Studebaker, the widow of deceased's brother, in taking care of Studebaker until he died. Studebaker was not able to read or write. He was a man of large stature when in robust health, weighing over 200 pounds. He was a member and trustee of a Baptist church in that vicinity, belonged to a

local cemetery association, was a man of strong will power, and was a respected and prosperous citizen in the community where he lived. He had a sick spell during the winter of 1915 and 1916 and was confined to his bed for several months. While so confined, on December 15, 1915, attorney Follett, of Ottawa, was called to the Studebaker house and at the request of Studebaker two bills of sale were drawn up and executed, transferring certain personal property to Mary Studebaker and other personal property to Richey. At this same time he made a lease of a portion of the farm to James Wilson and another lease of approximately 160 acres to Richey, the term to extend for three years from March 1, 1916. Studebaker rallied from this illness and was out of the house and about the farm and neighborhood to some extent during the summer of 1916, but he never again regained his former strength and vigor. He became confined to his bed during August, 1916, with cancer of the stomach, which resulted in his death in December of that year.

The will and deed involved in this litigation were executed on August 31, 1916, at the home of Studebaker. On the day before, attorney McDougall, of Ottawa, was called to come to the house of Studebaker, and he took a stenographer with him to the farm. The attorney was there for an hour or two talking with Studebaker about his affairs, and the conversation relative to the disposition of the property which Studebaker desired to make was taken in shorthand by the stenographer. The will and deed were prepared by McDougall at his office in accordance with the notes taken by the stenographer, and in the afternoon of August 31 McDougall and George Grover, cashier of the Ottawa Banking and Trust Company, whom Studebaker had requested McDougall to bring along as a witness, drove out to the farm home of Studebaker, where the will and deed were read to Studebaker, commented upon to some extent by him and then signed by using his mark and wit-

nessed by McDougall and Grover. No one else was present in the room during any of the conversations between McDougall, Grover and Studebaker. The deed was given to Grover by Studebaker, with instructions to deliver it to Richey upon the death of the grantor, which was done.

The will in substance provided for the payment of $1000 to Mary Studebaker, the widow of deceased's brother, $500 to Verna Studebaker, a daughter of said deceased brother, and $500 to each of two sisters living in Ohio. The bills of sale to Mary Studebaker and Paul Richey, dated December 15, 1915, transferring certain personal property to each of them, were mentioned and confirmed. Forty acres of land were given in trust to the executor and trustee, to be rented, and the income, after payment of taxes and repairs, to be paid to testator's daughter, Icy Gregory, during her lifetime, and thereafter the proceeds of sale thereof or the land was to go to the three grandchildren, Paul Richey and Juanita and Wilson Mers, when they became twenty-five years of age. If they were not twenty-five years old the land was to be rented for them until they attained that age, and if any of them died without issue it was to descend to the issue of the survivors. All personal property was also given to the trustee, and $10,000 thereof was to be invested, the interest to be paid to the daughter, Icy Gregory, during her life, and upon her death to go to the same three grandchildren or their survivors under the same age limitation mentioned, and if any grandchild died leaving issue, the children of the deceased grandchild to take the grandchild's share. The will also gave 100 acres of land to the trustee for the benefit of two of his grandchildren, Juanita and Wilson Mers. The will mentioned the making of a deed on the same date, conveying to Paul Richey, testator's grandson, a certain 100 acres of land, and recited that if for any reason the deed should not be effectual to vest and convey title in the grantee, "I hereby give, devise and bequeath said land to my said grandson, Paul Richey,

as his sole and absolute property forever." The provisions
of the will were such that at the death of his daughter,
Icy Gregory, who had no children, her interest would de-
scend to the three grandchildren, Paul Richey and Juanita
and Wilson Mers, and also so that none of testator's prop-
erty could in any manner pass to either his daughter's hus-
band, Will Gregory, or his other son-in-law, who was the
father of the two Mers children. The will further pro-
vided that no beneficiary who might seek to set aside the
will should receive any property under it. The will was
properly admitted to probate on February 8, 1917.

Many errors are assigned on the part of appellants, the
most important of which are, that the verdict of the jury
is contrary to the law and the evidence; that the court
erred in giving, modifying and refusing instructions; that
incompetent evidence was admitted on the trial of the case;
and misconduct of counsel for contestant in the examina-
tion of witnesses and in argument of the case to the jury.
Cross-error was assigned by appellee on the court's action
in withdrawing from the consideration of the jury the issue
of fraud and undue influence. We will first consider the
cross-error.

Appellee contends that a fiduciary relation existed be-
tween Jeremiah Studebaker and Paul Richey, and that on
account thereof the issue of fraud and undue influence
should have been submitted to the jury for its determina-
tion. Richey was a grandson of the testator, but had never,
so far as this record shows, had any particularly close as-
sociation with his grandfather until after the latter, in the
fall of 1915, went over to Hampson's farm, where Richey
was working, and asked Hampson to let Richey off so that
he could come and live with the testator. From the time
Richey came to Studebaker's house until the latter's death
Richey did the necessary work about the place and per-
formed any duties or missions desired by his grandfather.
The uncontradicted testimony in the record shows that

307—15

Studebaker executed the bills of sale of certain personal property to his housekeeper, Mary Studebaker, and to Richey, in the manner he desired during December, 1915, and also made leases of his land at that time. Studebaker during June, 1916, attended Richey's wedding, and by witnesses on both sides of this case it was shown he was quite fond of the boy and intended to do well by him. The deceased during that year arranged for the repair of some of his cribs on the place, paid out money to parties from time to time as he desired, took care of his own money, and on September 26, 1916, entered into an agreement with and paid the cemetery association certain moneys for the permanent care of his cemetery lot. The only testimony on the question of undue influence in the record in any way connecting Richey with the execution of the will is that of Mary Studebaker, who said, "As I recollect, it was Paul that telephoned for him [attorney McDougall] to come out," and the testimony of McDougall, Hilda Lutz and George Grover. McDougall testified in detail as to his visit on August 30, 1916, at the Studebaker house with the stenographer, where, after an extended conversation with Studebaker, the attorney obtained the data for the disposition of the property of deceased. The witness testified he had known Studebaker many years and had previously drawn a will for him. He did not know Richey and did not remember ever having seen him before the will was executed. When he went to the Studebaker home on August 30 he was admitted to the house by a middle-aged lady, who the proof shows was Studebaker's brother's widow. Hilda Lutz was the stenographer who accompanied McDougall to the Studebaker home. The only person besides Studebaker she saw in the house was a lady. The stenographer took down in shorthand the conversation between McDougall and Studebaker about how he desired to dispose of his property. After their return to Ottawa, either that day or the next day, the stenographer read her

notes to McDougall, and from them he dictated the will and deed. The notes were lost and never transcribed. Mc-Dougall also testified to the preparation of the will and deed and his return to the farm house on the following afternoon with George Grover, cashier of one of the Ottawa banks. He stated that Studebaker told him how he wanted his will made and what land he wanted to convey to Richey by deed; that no one else was present in the room, nor did he talk with anyone at the house when he and his stenographer obtained the instructions from Studebaker, and that no one besides himself and Grover was present in Studebaker's room when the will and deed were executed. He further testified that Richey had never talked to him about a will for his grandfather, and that the will and deed were made exactly as Studebaker wanted them. Grover's testimony corroborated McDougall's testimony upon the important fact as to who was present when the will was executed, that he had never talked to Richey about a will prior to its execution, and that the will was read to Studebaker and he said it was as he wanted it.

Undue influence that will avoid a will must be directly connected with the execution of the instrument and must be operative when the will is made. The influence must be directed toward procuring the will in favor of certain parties and be such as to destroy the freedom of the testator's will and purpose, thereby making the instrument more the result of the will and intent of another or others than that of the testator himself. (*Snell* v. *Weldon,* 239 Ill. 279; *Bowles* v. *Bryan,* 254 id. 148.) Where a confidential relation exists between a testator and a beneficiary, that relation does not necessarily raise or create a presumption of undue influence. That relation, to create such presumption, must be used for the purpose of procuring the making of a will. (*Chaney* v. *Baker,* 304 Ill. 362.) In our analysis of the competent testimony we find nothing indicating that the execution of the will was procured by the influence of

Richey operating on the mind of Studebaker. There is no substantial evidence that the business of Studebaker was referred to and transacted by Richey, or that the testator did not control, direct and understand the care and man- agement of his affairs and such business as he had to do. We think the court properly sustained the motion of appel- lants to withdraw from the jury the issue of fraud and un- due influence.

Appellants complain of incompetent evidence being ad- mitted over the objection of their counsel. Appellee sought to prove that Studebaker obtained his start in life from money or property received from his first wife. Ross, a witness for appellee, was asked by her attorney if testator ever told witness he started accumulating his property with money given him by his wife,—meaning his first wife, the mother of the appellee. Questions on that line were asked, to which the court sustained objections. Then the witness was asked if testator ever said anything about how he got his start. An objection to that question was overruled and witness was asked what the testator said, and answered, "He said he got his start from money his first wife had." The witness was then asked what testator said he bought his land with. Objection to the question was sustained, and on motion of appellants' counsel the former answer was excluded. Counsel for appellee stated he thought the evidence competent because counsel for appellants had asked the witness, on cross-examination, if testator had not told witness he started low and worked up and accumulated his property by his own efforts. Another witness for appel- lee was asked by counsel if he knew whether testator's first wife brought or contributed to him any money. An ob- jection was sustained, and counsel then asked the witness three other questions of the same kind, to each of which the court sustained objections. Counsel then asked the wit- ness if he ever had any conversation with testator about that matter, to which appellants' objection was overruled

and the witness answered he did. He was then asked to relate the conversation, to which objection was made and sustained after considerable colloquy between court and counsel, during which counsel for appellee offered to prove by the witness that testator told him he had, soon after marriage to his first wife, received money from her which she had inherited and he invested it in the land. The court sustained an objection to the offer. Such testimony was not competent on any issue involved in the case, and the repeated questions to the witnesses after the court's ruling, and the offer of proof made by counsel for appellee, which, so far as the record shows, was in the presence of the jury, could only have the effect of creating prejudice in the minds of the jury. The offer to introduce such testimony should at least not have been persisted in after the court ruled it was incompetent. In *Turnbull* v. *Butterfield,* 304 Ill. 454, an instruction given told the jury to take into consideration, among other things, the source of testatrix's title in determining her mental capacity. The property had been deeded to testatrix by her deceased husband. The court said the instruction was erroneous; that from what source testatrix derived her title had nothing to do with the question of her testamentary capacity, and its only effect would be to call to the minds of the jury the fact that the property had been deeded to testatrix by contestant's father. Appellants offered instructions directing the jury not to consider any testimony offered to show the testator bought any of his land with money received from his wife, but the court refused to so instruct the jury.

Counsel proved by witnesses, over the objections of appellants, that they had seen appellee, prior to her leaving her father's home about the time of his second marriage, doing all kinds of work on the farm, such as planting corn, running the binder ánd mower, and hauling posts. This appears to have been admitted on the theory of appellee's counsel that it was competent for the purpose of showing

the appellee helped build up the place and what her father thought of her. That testimony was not competent on any issue involved in the case and should not have been admitted.

The record shows evidence was admitted, over objection, showing statements or declarations made by Studebaker, which, in substance, were that the will was changed and made the way Richey wanted it. It has been held by this court in many cases,—and it is unnecessary for us to go into detail as to the reasons therefor,—that declarations or statements of a testator or a grantor cannot be admitted in evidence for the purpose of invalidating either a will or deed. (*Waters* v. *Waters,* 222 Ill. 26.) The only purpose for which such declarations are competent is to show the mental condition of the testator. *England* v. *Fawbush,* 204 Ill. 384.

Appellants also complain of a ruling by the court denying their motion to require complainant to file new and additional security for costs, she at all times having been a non-resident of Illinois. At the time of filing the bill, in February, 1918, Herbert Wiley, a law partner of one of complainant's counsel, became security. Wiley died on some date not shown, between the time of the filing of the bill and the date of trial, and on the day of trial, January 17, 1922, the motion for security for costs was made by appellants. This court decided in *Wilkinson* v. *Cox,* 228 Ill. 306, that a motion to rule a non-resident complainant to give security for costs is a dilatory motion and should be made at the earliest time possible. In that case the motion was not made until after the case had been taken upon the regular call of the docket, and the court held the motion was made too late. So in this case, the motion not having been made until the day of the trial of the cause, we think the court properly overruled it.

It is also claimed by appellants that they were denied the right, upon cross-examination of some witnesses who thought testator unsound of mind, to inquire as to what

Studebaker said or did or what the witness observed in the action or conduct of Studebaker which indicated his unsoundness of mind. We think it proper, upon cross-examination, for such inquiry to be made, as the proponents have a right to know just what the witness observed and 'on what facts he bases his opinion of testator's unsoundness of mind.

It is further complained of that one of appellee's counsel misconducted himself during the progress of the trial and in his argument to the jury. We shall not dwell upon this point. It is well understood that the conduct of every court, the officers thereof and the attorneys should be such that the parties litigant may have, as nearly as possible, a fair and just trial. The record here shows the trial of this case lasted for several weeks and to have been rather hotly contested, with more or less disrespect shown by counsel to each other, and for which misconduct of counsel on both sides the court admonished them. Upon several occasions in the examination of witnesses, when objections were sustained, it seems that substantially the same questions were repeated, necessitating continued objections and rulings upon the same subject matter. This should not have been done. In the argument to the jury by one of appellee's counsel the court sustained objections made by appellants' counsel on several occasions. There were reflections and statements made which had no place in the argument and were calculated to prejudice appellants.

Complaint is made of many instructions given for appellee, of the refusal of several asked by appellants, and the modification of a number given for appellants. Appellants asked the court to give forty-three instructions. The court gave eleven as asked, modified thirteen and gave them as modified, and refused nineteen. On behalf of appellee the court gave fifteen instructions. Complaint is made of the court's rulings in modifying and refusing substantially every instruction modified or refused and giving the most of appellee's instructions. We do not feel disposed to take up

and discuss each complaint about each of the instructions separately. We do not see how it is possible that so many instructions should be necessary to inform the jury of the law governing such a case, without great repetition. The real question to be determined by the jury was whether the testator possessed testamentary capacity to make a will. It has been frequently decided that a man need not be of absolutely sound mind and memory to make a valid will. He must have the mental capacity to understand he is making a will, must be able to comprehend what property he has to dispose of, must know who are the natural objects of his bounty, and understandingly make disposition of his property according to some plan formed in his mind. The definition of Redfield on Wills, 123, which this court has repeatedly approved, is: "The result of the best considered cases upon this subject seems to put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about." This definition was approved in *Yoe* v. *McCord,* 74 Ill. 33, where it was said the statement in the last part of the rule is intelligible and embodies about the whole rule upon the subject which can be profitably stated to a jury. The court said: "When a court undertakes to inform them what amount of mental capacity a man must have to know and understand what he is about it is futile, and tends rather to mislead than to afford any practical aid to a jury." The statement of the rule in that case was approved in *Todd* v. *Todd,* 221 Ill. 410. (See, also, *Craig* v. *Southard,* 148 Ill. 37; *Ring* v. *Lawless,* 190 id. 520; *Coleman* v. *Marshall,* 263 id. 330.) The definition of testamentary capacity stated or approved in those cases has been stated or approved in many other cases decided by this court. If in some cases it has been said the testator must be able to comprehend the effect and consequences of his will, it was not meant

that he must know the legal effect or construction to be given his will. It was only meant he must know how he disposed of his property. (*Dowdy* v. *Palmer*, 287 Ill. 42.) Some instructions,—at least appellee's instruction 34,—as to what constitutes testamentary capacity, did not state the law correctly, and others, without stating what capacity was sufficient to enable one to make a valid will, told the jury if they believed, from a preponderance of the evidence, Studebaker was not of sound mind and memory, they should find the instruments were not the will and deed of Studebaker..

What we have said on this subject should be sufficient on another trial of the case to enable the parties to correctly instruct the jury, and we will not further discuss the errors assigned on the court's rulings in giving, refusing and modifying instructions. It is entirely possible to state all the law applicable to the case in a comparatively few and simple instructions. In this case the will by its terms unequally divided testator's property. In such cases it is necessary that a jury be properly and correctly instructed on the issue of mental soundness. Where some of the instructions do not correctly state the law it is impossible for any court to tell what instruction or instructions were followed by the jury in arriving at their verdict. *Kath* v. *East St. Louis Railway Co.* 232 Ill. 126.

It is very earnestly insisted the verdict and decree were contrary to the overwhelming weight of the testimony and the decree should be reversed on that ground. As the decree must be reversed for other errors referred to, we will not undertake to set out the substance of the testimony of the witnesses in detail. There was proof tending to show the will was, so far as the provisions for appellee are concerned, substantially like one or more former wills made by the testator, and that he at least considered he had reasons for making the will as he did make it. There were more witnesses who testified in support of the proposition that he had mental capacity to make a valid will than there

were who testified he did not have such capacity. So far as the record discloses, appellants' witnesses were equally credible with appellee's witnesses, and their opportunities for knowing the facts they testified to were as good as the opportunities of the witnesses for appellee. The evidence was such as to require that the record should be free from any error of a prejudicial character. The record is not free from such errors in the introduction of testimony, the giving and refusing of instructions and in the conduct and argument of counsel. What we have said on this subject is sufficient for the guidance of the parties on a new trial and need not be further discussed.

The decree of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*